290 So.2d 251

Jesse Leon **JONES**

v.

**STATE.**

I Div. 375.

Court of Criminal Appeals of Alabama.

Feb. 12, 1974.

J. Knox Argo, Montgomery, for appellant.

William J. Baxley, Atty. Gen. and Dan W. McCoy, Sp. Asst. Atty. Gen., for the State.

LEIGH M. CLARK, Supernumerary Circuit Judge.

This is an appeal from a judgment convicting appellant-defendant of murder in the first degree and sentencing him to life imprisonment in the penitentiary, in accordance with a jury verdict.

The State's witnesses as to the circumstances of the killing were Stanley Walker, a son of the victim, and Martin Madison, 16 years of age at the time of the trial. Stanley testified that he arrived at the filling station, the scene of the homicide, about noon to help his father who was working and in charge of the filling station at the time; his father was wearing a Timex watch with a silver band; while Stanley was changing oil in his car, a man with a gun came up to him and told him to go "up front" where his father and a customer were at the time; Stanley's father lunged at the man with the gun; Stanley heard four gun shots as he ran from the scene. According to Stanley, the man had a "large bandana" over his mouth and face but ran away without the handkerchief.

Martin Madison testified that he heard the shots and saw a white man running from the station, who was saying, "You shot my daddy" and "You killed my daddy." He also saw a black person in a white T-shirt and dark pants, whom he had seen three or four times before, run from the station. He identified the latter as the defendant, Jesse Leon Jones. Martin testified also that he identified defendant out of a line-up.

Also testifying for the State was Mattie Henderson, who had known defendant for eight years and who had lived next door to him. She testified that she was at the Brown Dot Social Club from 12:00 to 2:30 P.M. on the day of the homicide, that defendant came into the club wearing blue

pants and "a white man's jacket" and said that "he thought that he had killed old man Pope" who was "the old man that runs the filling station." She also testified that prior to the arrest of defendant, he gave her a Timex watch which, along with $27.00 he had previously given her the same day, she returned to him about 5:00 P.M. the day of the killing. She stated that she had been drinking heavily when defendant came into the Brown Dot Social Club.

Addie Lee Fantroy, who had known defendant for about eight years, testified that she saw him in a block and a half from the service station where the Mr. Walker was killed between 2:00 and 2:30 P.M. of the day in question. At that time, defendant was wearing a torn white T-shirt and khaki pants; there was blood on the shirt, and defendant had a pistol in his left hand.

Willie J. Moore, a witness for defendant, said that he took a truck to Pope's service station about 12:00 or 1:00 on the day involved. After leaving and walking across the street he heard a pistol fire, and when he looked through the hedges he saw a white man run up the street. He also said he saw a black man wearing a blue shirt run out of the service station. He testified that it was not the defendant, whom he had known for many years.

Defendant testified that he had spent most of the morning drinking and taking pills at various places. After he went to sleep in the back of a friend's car, he was awakened by the friend who said that they were in trouble. He got out of the car and started walking. He went to the Brown Dot Social Club and there told Mattie Henderson that his friend had shot a man. He admitted that he gave Mattie some money, but denied that he gave her a watch.

Defendant's grandmother testified that when defendant, who lived with her, came home that evening his white nylon shirt was not damaged and that neither his trousers nor his shirt had blood on them.

According to the coroner, deceased had two bullet wounds in the front and one in the back of his neck, and his death was caused by gunshot wounds in the heart.

The owner of the filling station, Charles H. Pope, a brother-in-law of decedent, in testifying for the State, said that deceased had left a ticket for $28.00 in the register, which money deceased had drawn out to pay some bills the following morning.

Defendant and others escaped from jail on January 12, 1972. He was apprehended in Detroit in March 1972 and returned to jail in Mobile. His trial commenced on January 31, 1973.

▮ Appellant urges that reversible error was committed by the court's permitting the State to cross-examine defendant as to some details of a disorderly conduct charge against him. The questions asked, the objections of defendant, the ruling of the court and the answers given are found in the following portion of the record:

"Q Now, that disorderly conduct charge that you were arrested on, Mr. Jones, wasn't that sworn out by your grandmother?

"A Not to my knowledge.

"Q Do you know who swore the warrant out for you?

"MR. ALONZO: Judge, I'm going to have to object to that; that's all immaterial as to why a disorderly conduct—

"THE COURT: It has already come in though—

"MR. DOYLE: He's the one that brought it up, Judge.

"THE COURT: Yes, he brought it in —and I'm going to let them go into the other part of it; overruled.

"MR. ALONZO: Judge, I don't see where it's material why a disorderly conduct—it's a misdemeanor at the most, and the mere fact that he was arrested

does not give rise to going into details of why.

"THE COURT: Well, I'm just ruling that since he brought out part of it, I'm letting them bring out the rest of it.

"MR. ALONZO: It could be for spitting on the sidewalk.

"THE COURT: Well, I've ruled; and you can have an exception. Go ahead.

"MR. DOYLE: Do you remember who that was that signed that warrant against you, Mr. Jones?

"A Not exactly, no.

"Q Could it have been your grandmother?

"A It was someone in my family.

"Q Do you recall what gave rise to that warrant being issued for you?

"A Me and my grandfather had an argument over the car.

"Q And that's what it was?

"A Yeah."

On direct examination of defendant, the following questions were asked and answers given:

"Q All right. Let me ask you this, Jesse: Have you ever before been convicted of a felony?

"A No.

"Q No felony convictions whatsoever?

"A No.

"Q Disorderly conducts?

"A Yes, sir.

"Q Have you ever served any time in prison for anything?

"A No, sir."

The trial court's ruling is supported by the well established rule that a party who has brought out inadmissible evidence has no valid complaint as to the action of the trial court in allowing his adversary to introduce evidence on the same subject. Gordon v. State, 129 Ala. 113, 30 So. 30, Gibson v. Gaines, 198 Ala. 583, 73 So. 929, Louisville & N. R. Co. v. Quinn, 146 Ala. 330, 39 So. 756. As stated in Alabama Power Co. v. Nichols, 282 Ala. 704, 213 So.2d 912:

" . . . Other points aside, the matter having been first brought out by the party now complaining, we cannot put the court in error for allowing the full inquiry. Catts v. Phillips, 217 Ala. 488, 117 So. 34; Ford v. Bradford, 218 Ala. 62, 117 So. 429."

We do not think the trial court was in error in its ruling, but even if it were, we hardly see how defendant could have been injured thereby. We are convinced by an examination of the whole record that it probably did not injuriously affect substantial rights of the defendant, and that Supreme Court Rule 45, Title 7, Appendix, Code 1940, should apply.

Appellant insists that error was committed in not allowing defendant to show whether he had been put in solitary confinement at the jail from which he escaped. The particular ruling is found in the following portion of the record:

"Q Jesse, describe the jail conditions to these people here.

"A The food was terrible; no recreation; (inaudible); no recreation; didn't give you your mail when you wanted it.

"Q Jesse, it was like an animal being locked up in a cage—

"MR. DOYLE: Judge, I'm going to have to object to that.

"THE COURT: Sustain that objection; that's argumentative.

"MR. ALONZO: Go ahead, tell us some more about that jail's conditions, Jesse.

"A They would not give you your mail when you wanted it, and if you say any-

thing to them about it, they put you in the hole.

"Q  The hole?  What is the hole? I'm not sure these people know what you're talking about.

"A  Solitary confinement.

"Q  All right.  Were you ever put in solitary confinement over there?

"MR. DOYLE:  Judge, I object to that; he's going a little afield.

"THE COURT:  As to the details of the confinement, I sustain the objection."

■ When the State introduces evidence of flight by defendant, he is entitled to the benefit of evidence which tends to show that his flight was prompted by circumstances other than a consciousness of guilt. Peoples v. State, 256 Ala. 612, 56 So.2d 665, McAllister v. State, 30 Ala.App. 366, 6 So.2d 32.

■ The court allowed defendant's counsel considerable latitude in showing the condition of the jail.  Some of the unfavorable conditions are shown in the testimony quoted above.  Other unfavorable conditions were shown by defendant's counsel in his cross-examination of the chief jailer, who testified that the jail was operating under crowded conditions, that prisoners were locked up "in a cell of relatively small size with a large number of other prisoners under crowded conditions with no means of recreation, no means of any activity other than to just sit in that cell."  He said the prisoners were not allowed to leave the confined areas unless they were taken to the nurse or the docket room, "or something like that."  He further said that prisoners did not have any way to get out in the sunshine.  In the light of all the testimony, we cannot say with certainty that defendant's counsel was attempting to show that defendant had been placed in solitary confinement.  Furthermore, we are unable to say whether he was attempting to show that defendant was placed in solitary confinement after his es-

cape and return to the jail.  Evidence along such line would have been irrelevant to the question of his reasons for escaping. That an affirmative answer to the question could have been referable, inclusively at least and perhaps even exclusively, to solitary confinement after his return to jail from his flight to Detroit is clear, as he had been in jail approximately ten months after his return from Detroit.  If the purpose of the question was to show that defendant had been placed in solitary confinement prior to his escape, the question should have been limited to that period of time.  If a question is so indefinite in some material respects that irrelevant evidence would be responsive to it, the trial court cannot be put in error for sustaining an objection to it.  Phillips v. State, 162 Ala. 14, 50 So. 194; Sloss-Sheffield Co. v. Ross, 201 Ala. 160, 77 So. 686; Butler v. Walton, 36 Ala.App. 319, 56 So.2d 369, cert. denied 257 Ala. 714, 56 So.2d 379. *Phillips* is to the precise point, in application as well as in principle, in that it was a case in which there was evidence tending to show flight by defendant, and the particular question involved was asked in an attempt by defendant to explain the testimony as to flight.  The court held:

"The evidence showed that on the Sunday morning after Van Wright was killed (the killing occurring on Saturday), but before his body was found, the defendant boarded the eastbound train at Wadley, 'and left the community,' carrying a suit case and a gun case. Miss McGinty, a witness for the defendant, testified that she lived in the town of Langdale, in Chambers County, Ala., and that she knew the defendant.  Defendant's counsel then asked Miss McGinty this question: 'Did he have an engagement to visit you on the Sunday he was arrested?'  The purpose of the testimony sought to be elicited by the question, it may be conceded, was to explain the testimony tending to show flight; but the court cannot be put in error for sustaining the objection to the question.

For aught that is revealed by the question or what had preceded the asking of it, the defendant may have had an engagement to visit the young lady, and yet the engagement might have been made after defendant reached Langdale; and if so, it is obvious that the testimony in answer to the question would have been wholly immaterial and irrelevant. Where a question is so general that irrelevant evidence would be responsive to it, the trial court cannot be put in error for sustaining an objection thereto.— Ross' Case, 139 Ala. 144, 147, 36 So. 718. There was no offer, before the court ruled, to show that the engagement was made before defendant started from Wadley. Moreover, at the time the question was propounded to the lady, there was no proof, nor offer to prove, that Phillips went to Langdale, nor that he had started to Langdale, or in the direction of Langdale."

■ Defendant moved for the jury to "visit the jail and see the conditions that would cause a man to leave." A view of the jail by the jury for the purpose avowed could have posed more problems than it solved, and attendant unpreventable circumstances could have been more disconcerting and misleading than enlightening. At any rate, whether a jury should be allowed to view a scene, or an object involved, is within the discretion of the trial court, as to which there was no abuse in this case. Townsell v. State, 255 Ala. 495, 52 So.2d 186; Brown v. State, 229 Ala. 58, 155 So. 358; Cronnon v. State, 46 Ala. App. 632, 247 So.2d 387.

■■ Appellant by his attorney on appeal, a different attorney from the one representing him on the trial, insists that the trial court erred in admitting into evidence the statement by defendant when he was arrested two months after his escape, "It's all over. It doesn't make any difference now; I'll never get out of jail anyway." The statement and some of the immediately preceding questions and answers of the witness testifying as to the statement, the special agent with the Federal Bureau of Investigation stationed at Detroit, Michigan, are as follows:

"Q   Did he make a statement while he was in that hall?

"A   Yes, sir, he did.

"Q   Was that statement in response to anything that you may have said, or anyone in your presence may have said to him?

"A   No, sir.

"Q   All right, sir. What, if anything, did he say?

"A   As we walked down the hall he just went limp on us—

"MR. ALONZO: I didn't understand —you said he went—

"THE COURT: Did you say he went sick or he went limp?

"WITNESS: He went limp, and it almost caused us to have to literally take him down the hall, and then he began to mumble and say, 'It's all over. It doesn't make any difference now; I'll never get out of jail anyway.' And these were the first comments that he made at all to us other than the response to what his name was.

"MR. DOYLE: That's all.

"MR. ALONZO: No questions.

"THE COURT: You may step down. (Witness left Courtroom.)"

It is to be noted that no objection was made at the time to the question that was immediately followed by the witness's testimony that included the particular statement of defendant. There was no motion to exclude the testimony as to what defendant said. Appellant says that the statement was not relevant to the charge for which he was on trial. The testimony was that of a rebuttal witness. When the State announced, after defendant closed his testi-

mony, that the State had a rebuttal witness, there was a colloquy among the court, counsel for the State and counsel for defendant, some of which was in, and some out of, the presence of the jury. The court inquired as to what the State proposed to show by the rebuttal witness, and when counsel for the State stated that he expected to show by the witness that defendant gave him a name other than his correct name and that he stated, "My life is ended; it's over.", defendant's counsel stated that he didn't think "that has any materiality." While the witness was being examined in the presence of the jury and after he had testified that the defendant at first denied his real name, counsel for defendant objected "to any other statements made by the defendant at all such time" and, in the discussion that ensued, counsel stated that "unless he can show that the proper predicate was laid, I object to any statement as made by this defendant regarding any matter." It seems that defendant's counsel was then making the point that warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, were not shown to have been given before the statement was made. The court then indicated that the statement would be admissible if it was spontaneous. Counsel for the State then developed that it was spontaneous, that it was not in answer to any question asked defendant. Thereafter there was an objection by defendant's counsel as to an answer of the witness on the ground that it was not responsive to the question, and there was another objection to the continuation of an answer that was not responsive to the preceding question.

There is no contention here that defendant was deprived of his rights safeguarded by *Miranda*, it being apparently conceded that *Miranda* does not apply to volunteered, spontaneous statement of defendant. The appellant does not here contend that the statement was inculpatory and says "Hence, there was no connection between the Defendant's statement and the murder charge." Our view is that the record shows that defendant did not make a timely and appropriate objection prior to the answer made by the witness and did not move thereafter to exclude any part of the answer. The admission of the statement in evidence was not error. Lucky v. State, 50 Ala.App. 324, 278 So.2d 772; Carpenter v. State, 42 Ala.App. 618, 174 So.2d 336; Massey v. State, 49 Ala.App. 341, 272 So. 2d 267, cert. denied, 289 Ala. 747, 272 So. 2d 270. Furthermore, if the evidence was inculpatory, we are of the opinion that it was admissible. On the other hand, if it was not inculpatory, we are of the opinion that it was harmless.

■ The only remaining insistence on error pertains to the action of the trial court as to an alternate thirteenth juror, the subject of which is covered by Vol. 14A 1965 Cum.Supp. to Vol. 14 1958, Code of Alabama, Appx., §§ 543(1)–543(18), applicable exclusively to Mobile County. Provision is made therein for one or two alternate jurors to be added, within the discretion of the court. By § 543(14), when one is to be selected, the parties are required to strike from a list of thirty-four jurors until thirteen names remain on the list and "Thereupon the court shall select by lot one name from such thirteen names" who shall be the alternate juror. The trial judge selected by lot the name from the thirteen upon completion of the selection of the jury, but he did not reveal the name of the alternate juror to himself or to anyone else until the submission of the case to the jury, at which time the name was revealed, and the alternate juror was excused. We approve the trial judge's method of handling the matter, which we believe was in compliance with the statute. No authority has been cited to the contrary, and no objection or exception was taken by defendant to the action of the trial judge in this respect.

Mindful of our duty under Title 15, § 389, Code of Alabama 1940, we have searched the entire record for prejudicial error and have found none. The judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Hon. LEIGH M. CLARK, Supernumerary Circuit Judge, serving as a judge of this Court under § 2 of Act No. 288, July 7, 1945, as amended; his opinion is hereby adopted as that of the Court.

The judgment below is hereby

Affirmed.

All the Judges concur.