316 So.2d 355

**James Lee HELTON, alias**

v.

**STATE.**

**7 Div. 328.**

Court of Criminal Appeals of Alabama.

June 30, 1975.

Rehearing Denied July 29, 1975.

Bill Thompson, Talladega, for appellant.

# 430

William J. Baxley, Atty. Gen. and David W. Clark, and Jane LeCroy Robbins, Asst. Attys. Gen., for the State.

TYSON, Judge.

The Grand Jury charged the appellant with the first degree murder of Joe Wheller Deerman "by shooting him with a pistol." The Jury's verdict found the appellant guilty as charged and fixed punishment at imprisonment in the State penitentiary for life. The trial court then pronounced judgment, setting sentence in accordance with this verdict.

Richard Roper testified that he was employed by the State Department of Toxicology and Criminal Investigation. He stated that on October 17, 1973, he examined the body of "Pop" Deerman, the decedent in this case. He said that he found a bullet wound in decedent's chest surrounded by what he concluded were gun powder particles. Roper said he traced the bullet path through the heart and removed the mutilated bullet from the vertebral column. He stated that in his judgment the bullet was a .22 caliber. He also concluded that death resulted from hemorrhage and shock from a single gunshot wound to the chest. He stated that in his opinion the gunshot was fired at a relatively close range, within five or six feet.

Olin Green testified that he operated three service stations in the Talladega area. He said the decedent had worked for him for about two years. He said he talked to decedent about 11:40 p. m., on Tuesday, October 16, 1973, the night of the killing. Green stated that he calculated that $319.00 in cash was missing from the decedent's store. He said decedent lived in the back area of the gas station-bait shop, and that he usually closed the shop around midnight.

On cross-examination, Green stated that the decedent had poor eyesight and always wore eye-glasses. He also said that decedent kept a shotgun by his bed at the store. He said that if a stranger came to the door, decedent would customarily carry the shotgun to see who was there. Green stated that he had never seen the defendant before. He said that decedent always kept the money tray hidden in a particular corner. Green said there was no evidence of a search for the money tray. He said he saw the decedent's body; his shotgun and glasses remained by the bed. He agreed that based on his knowledge of "Pop" Deerman and his habits, he had never heard of him going to the door at night in his undershorts, without glasses, and without his gun.

James Griffitt testified he arrived at the scene of the killing on the morning of October 17, 1973. He said the lights were on and the door unlocked, so he went inside. Griffitt stated that the time was around 6:15 a. m. He called for the decedent, and when no one answered, he went around the cash register and into the back, where he found "Pop" Deerman lying on his side, wearing shoes, socks and undershorts which were pulled about half way down. Griffitt testified that he recognized the decedent as being dead.

Lawrence Cass testified that he arrived at the scene about the same time as Griffitt. He stated there was a "Closed" sign on the front door of the store. He said he followed Griffitt into the store and called

the Police Department after the body was discovered.

Sheriff Gene Mitchell testified that he talked to Helen Bridges later in the week. He stated that Helen Bridges took him and State Investigator Roy Riddle to the bait shop, where "Pop" Deerman was shot, and showed them a spot just past there where a car had been stopped. He said that she next took them down a dirt road near the bait shop and pointed out a spot along the side of the road where they found a discarded money box which was introduced into evidence.

On cross-examination, Sheriff Mitchell stated that he was aware that the defendant was arrested by the F.B.I. in Ohio, and that he had a .22 caliber pistol when arrested. He said that the toxicologist determined that the pistol was not the murder weapon.

Pauline Bridges testified that she was the mother of Helen and Ellen Bridges, and had known the defendant about ten years. She said Helen, her daughter, and the defendant woke her up on the night of the killing a little after midnight. She said the defendant was carrying a shotgun and a pistol, and had a stack of bills three inches thick. She testified that the defendant said, "I shot him." She said it appeared that the defendant had a fresh red substance on one of his shoes.

On *voir dire,* Helen Bryant Bridges testified that she had been accidentally shot three or four months previously, and that during the past five or six years she had been having problems with drinking and with her nerves. She said she had been in a mental hospital once for a brief period three or four years ago. She stated that every now and then, she had trouble remembering clearly. The court overruled defense counsel's request that Helen Bridges not be allowed to testify, leaving it up to the jury to determine what weight it would give to her testimony.

On direct examination, Helen Bridges stated that she had known the defendant for about eleven years, and that in October, 1973, he visited their house for a week or two. She said that on the night of October 16, 1973, she and the defendant Helton left her house alone sometime after dark. The defendant said he was going to Chicago and she could come along if she wanted. Helen Bridges testified that she did not know if the defendant had any money but that she did not see any. After leaving her house, they drove to Exell Nunn's house where Helton went inside and returned with a shotgun. She said they drove past the decedent's bait shop and gas station, and the defendant said, "We are running out of gas." She said the store had already closed, but defendant turned around and "rolled back down in front of the store." She said Helton left the car and went inside the bait shop. She waited five or six minutes during which time she heard no noises. Helen Bridges testified that the defendant returned with a money tray, four cartons of cigarettes, and a six pack of beer, but that he got no gas. They left and went to a dirt road where they parked, and defendant threw the money tray away. She said they drove back to her mother's house, that her mother let them in, and she got some clothes. While they were inside she saw a red spot on Helton's shoe. She stated that they left and drove to Brimingham where they spent the night in a hotel.

The next day the defendant sold the shotgun he had picked up the night before at Exell Nunn's house. Next, they drove to a used car lot. They left the lot in a new car, but she did not know if Helton paid for it. She said when they got to Indiana she saw the defendant with a pistol and a roll of money. She asked Helton where he got the money and he told her that he "shot the son-of-a-bitch." She said they drove to Chicago and back to Indianapolis where Helton gave her $40.00. He told her that if the police got after them, he would kill her and himself. The de-

fendant gave her $24.00 for a bus ticket, and she returned to Alabama on Friday after the Wednesday morning on which they left.

On cross-examination, Helen Bridges stated that she was married to Mack Bryant and also to a Wayne Wilson. She said Wilson had a 1966 Wine-colored Chevrolet. She said when she left Birmingham with the defendant, Helton, he told her that he had just escaped from the Florida State Penitentiary and that was his reason for running. She testified to her past mental history as she had on *voir dire*.

Oneal Kerns testified that he was a used car lot manager at Gateway Motors in Birmingham. He said that on the morning of October 17, 1973, the defendant stole a Camaro from his lot and left a 1965 red Chevrolet.

Exell Nunn testified that the defendant and Helen Bridges came to her house in Talladega about 9:00 p. m. on the night of October 16. She stated that they left around midnight.

The appellant's motion to exclude the State's evidence was overruled.

The defense produced four witnesses who testified that Pauline and Helen Bridges had bad general reputations in the community, that their reputations for truth and veracity were bad, and that they would not believe them under oath.

Two of these witnesses, Mr. and Mrs. Jere Ferrell testified that they lived next door to the bait shop. Each heard the sound of a car horn coming from the direction of the bait shop late the night of "Pop" Deerman's death, but neither heard a gunshot.

Ralph New testified that he was married to Helen Bridges' sister, Ellen. He said he drove by "Pop" Deerman's bait shop on the night of the killing at about 11:30 p. m., and saw a red Chevrolet parked out front. He turned around and drove back to the store. He saw a man walking from the store to the car and recognized him as Wayne Wilson, whom he had known all his life. He saw Ellen Ruth Bridges, Helen Bridges, and Louise Freeman sitting in the car. New stated that he followed the car to the Bridges' house. At this point, defense counsel asked the witness what Wayne Wilson had told him about "Pop" Deerman's death, and the State objected. The objection was sustained on the basis that the offered testimony constituted hearsay. From the record:

QUESTION BY. DEFENSE: "Yes, sir, now, Mr. New, on this occasion when you were talking with Wayne Wilson, a few days after Pop Deerman's body was found I want you to tell the jury what was said when it came over the radio Pop Deerman was shot sometime early in the morning.

"MR. HOLLINGSWORTH: That is rank hearsay, Judge, we object to that.

"THE COURT: Sustained."

On cross-examination, New testified that when he saw Wayne Wilson walking from the bait shop to the car on the night of the killing, Wilson was not carrying a cash tray. He also stated that the red Chevrolet with Wilson and the three women in it did not turn off on a dirt road after leaving the bait shop, but went straight to J. D. Bridges' house. He said there was no "Closed" sign on the front door of the bait shop when he saw the red Chevrolet there on the night of the killing, the door was open, and the outside of the place was lighted up. New testified that he had been by before when the store was closed, and that on those occasions only a single night light remained on outside.

James Lee Helton testified that he had past criminal convictions for various robberies and thefts. Though Helton admitted his presence at the bait shop on the night of the killing, his testimony was to the effect that he and Helen Bridges were on their way to Birmingham no later than 10:50 p. m. Aside from this time discrep-

ancy and his denial of the robbery or killing, the defendant's testimony was essentially the same as the State's.

The defendant's motion for a directed verdict and request for the affirmative charge were denied.

## I

Appellant contends that the trial court abused its discretion when the court refused to allow the jury to view the scene of the alleged crime when the characteristics of the scene were in issue and could not be adequately shown by other means.

■ Assuming arguendo that appellant properly raised this point at trial (which is not entirely clear from the record), the general rule is that in a criminal prosecution it is within the discretion of the trial court to determine whether the jury should be taken to the scene of the alleged crime. *Townsell v. State,* 255 Ala. 495, 52 So.2d 186; *Brown v. State,* 229 Ala. 58, 155 So. 358.

■ In the instant case, the testimony adduced at trial, which was supplemented by the use of a blackboard and chalk, was sufficiently descriptive of the scene of the alleged crime, and the trial court did not abuse its discretion by refusing the request. *Jones v. State,* 52 Ala.App. 184, 290 So.2d 251; *Dunaway v. State,* 50 Ala.App. 198, 278 So.2d 198, cert. denied 291 Ala. 777, 278 So.2d 200.

## II

Appellant next argues that the trial court committed reversible error by overruling his motion to exclude, his motion for a directed verdict, and denying his request for the affirmative charge.

In this regard, the appellant points out that Helen Bridges, the State's key witness in linking the defendant to the killing of the decedent, had a past history of mental instability. There were periods of time when she became confused and unable to remember. Also, her reputation for truth and veracity was undisputed as being bad.

In addition, appellant argues that the State did not introduce evidence to prove all the elements of the charge, and more particularly the time of death of the decedent.

■ After hearing her *voir dire* examination, the trial court determined that Helen Bridges was competent to testify and that her past mental problems would go to the weight and sufficiency of her testimony rather than its admissibility. The competency of a witness to testify is a determination within the discretion of the trial judge. *Trammell v. State,* 53 Ala.App. 246, 298 So.2d 666; *Metropolitan Life Ins. Co. v. James,* 228 Ala. 383, 153 So. 759. Whether a person's affliction with a mental defect is such as to incapacitate him to be a witness is a matter to be determined by the trial judge. Title 7, Section 439, Code of Alabama 1940; *Orton v. Gay,* 285 Ala. 270, 231 So.2d 305.

■ Once the court determined that Helen Bridges was competent to testify, her credibility became a question for the jury. *Williams v. State,* 50 Ala.App. 341, 279 So.2d 145; *Reeves v. State,* 186 Ala. 14, 65 So. 160.

■ The State proved that "Pop" Deerman was killed between 11:40 p. m., when Olin Green talked with him over the phone, and 6:15 a. m., when James Griffitt and Lawrence Cass discovered the body. Though the defendant testified that he and Helen Bridges had left Talladega for Birmingham by 10:45 or 10:50 p. m., there was also testimony which placed Helton at the bait shop after 11:40 p. m. on the night of the killing. The jury was free to believe the State's evidence on this point. Conflicting testimony is for the jury, and a verdict rendered thereon will not be disturbed on appeal. *Pugh v. State,* 51 Ala. App. 164, 283 So.2d 616; *Roberson v. State,* 162 Ala. 30, 50 So. 345.

### III

Appellant contends that he should have been allowed to cross-examine and impeach one Wayne Wilson by introducing his out-of-court statement to Ralph New concerning the crime in question. In this case, both the State and the appellant had subpoenaed Wayne Wilson, but neither side had called this witness. From the record:

"MR. MILANO: At this time, your Honor, I am going to move for a mistrial or in the alternative that these people put that Gary Wilson on the stand. He has made certain statements to this man. He has been under subpoena by the State. I sat here, he was sitting in the courtroom. How in the world can we get what this man said into evidence.

"MR. HOLLINGSWORTH: May it please the Court, wait a minute.

"MR. MILANO: Gary Wilson has told him.

"MR. HOLLINGSWORTH: Judge would you let this jury go out so that I can answer this man and keep this record clean.

"BY THE COURT: Take the jury out, Mr. Holcomb.

"(THE JURY RETIRED TO THE JURY ROOM IN THE CUSTODY OF THE COURT BAILIFF. The following proceedings occurred, out of the presence and hearing of the jury.)

"MR. MILANO: I don't mean to imply to you that this Prosecutor has done anything underhanded. I think he is one of the finest and fairest prosecutors I ever run into. I want to explain the position of the defense to you. We were called in here to start the trial Monday and the roll of witnesses was called and included one Gary Wilson. As a result of Mr. Thompson's research in this case and interviewing the witnesses, we have a witness, and there is no jury here and so I'm proffering to the Court, I'm not trying to get it to the jury, who tells us

that a witness who has been subpoenaed by the State, was with him, here is a newscast describing the killing and says: 'That's not even the way it was done.' Now, we find ourselves in the position of not being able to get that into evidence. It is hearsay. I am familiar with the rule of hearsay. It is pure hearsay. What someone says to you. The only way you defeat it is by asking the witness on the stand, 'Did you on such and such a date, to such and such a person, make the following statement?' 'Yes, I did'; 'No, I didn't.' Then when you put on your witness you ask that witness did so and so make this statement to you at such and such a date? What did he say to you on that day? The witness is then allowed to bring in that hearsay testimony. It is an exception to the hearsay rule. We find ourselves in the position now, where the court ruled he can't ask the question. And you ruled properly, Judge. At this posture it is pure hearsay. But it is not hearsay because of our fault. We were under the impression and I think validly under the impression that the man would be called as a witness. He has given a statement as we understand. He was subpoenaed by the State. He was here in Court. He did answer. We had no reason to believe he would not be a witness. That is our dilemma, and if I may, remind the Court that the State has rested. How in the world can we get to this jury what our witness said the man told him.

"THE COURT: What was your motion?

.    .    .    .    .    .

"MR. MILANO: Judge, Mr. Thompson has directed my attention to this. Let's make the motion, to move the Court.

"MR. HOLLINGSWORTH: Is Gary Wayne Wilson in Court. Here he is right here.

"MR. MILANO: I move the Court to either put Mr. Wilson on as the Court's

witness or to require the State to put him on as a witness.

"THE COURT: I'll overrule."

The appellant contends that because the trial court refused to call Wayne Wilson as a witness for the court, and further because the appellant did not want to call Wilson because of the Alabama "voucher rule" that the appellant was thus denied due process and a fair trial by not being able to cross-examine Wayne Wilson to establish part of the appellant's defense. The appellant cites us to *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L. Ed.2d 297, for the proposition that an evidentiary rule that a party cannot cross-examine or impeach "his own witness" in a criminal procedure is violative of the due process clause of the Fourteenth Amendment, and therefore unconstitutional.

■ A request by a party to have the court call a witness is a matter which is addressed to the sound discretion of the trial judge. *Keeby v. State,* 52 Ala.App. 31, 288 So.2d 813, cert. denied 292 Ala. 724, 288 So.2d 817.

■ Moreover, the rule is clear in Alabama in a homicide case where a party wishes to examine a witness concerning certain alleged contradictory statements, a predicate must be laid in order to introduce such contradictory testimony. *Strickland v. State,* 151 Ala. 31, 44 So. 90. See also *Goodwin v. State,* 1 Ala.App. 136, 56 So. 29.

As may be seen from the record, shown above, the appellant failed to call the witness in question, Wilson, to the stand, and then ask the trial court to allow him to take the witness on *voir dire* for the purpose of laying a predicate so that the trial court might then determine whether or not the witness should be treated as an adverse witness and allow the appellant to then cross-examine him.

■■ The trial court is under no obligation to call such a witness as the court witness, as for aught that appears, Wilson might have claimed his privilege of not testifying under the Fifth Amendment to the United States Constitution. The proper procedure in a situation such as here arose would be for the appellant to first explain the situation, out of the presence of the jury, to the trial court. The party should then call the witness to the stand and request the trial court to allow him to take this witness on *voir dire* examination for the purpose of laying his predicate, in order that the trial court would then have a proper basis for making its ruling, determining this witness to be an adverse or hostile witness. Without such predicate, the trial court is in no position to make a ruling such as was here desired. Therefore, the trial court could not be placed in error since the duty of laying this predicate was clearly on the party who desired to cross-examine the proposed adverse witness. Cases herein cited.

Thus, the question of the constitutionality of the so-called Alabama "voucher rule" is not presented inasmuch as there was here no proper predicate laid in the trial court.

We have carefully examined this record, as is required by Title 15, Section 389, Code of Alabama 1940, and find same to be free from error. The judgment of the trial court is due to be and the same is hereby

Affirmed.

HARRIS, DeCARLO, and BOOKOUT, JJ., and SIMMONS, Supernumerary Circuit Judge, concur.

CATES, P. J., not sitting.