A jury found this appellant guilty of rape in the first degree in violation of § 13A-6-61 of Alabama Criminal Code, which provides in pertinent part:
 "(a) A male commits the crime of rape in the first degree if:
 "(1) He engages in sexual intercourse with a female by forcible compulsion; or
"(2) . . .
"(3) . . .
"(b) Rape in the first degree is a Class A felony."
The statutorily prescribed punishment for a Class A felony is "for life or not more than 99 years or less than 10 years." §13A-5-6 (a)(1). The court fixed his punishment at imprisonment for fifty years and sentenced him accordingly.
Both the alleged victim and the defendant testified at the trial. She was thirty years of age, and he was twenty years of age. Both were prisoners in the Barbour County Jail, in which defendant was also a trusty. She was confined to a cell awaiting trial on a charge of murder of her mother-in-law. According to the undisputed evidence, there was sexual intercourse between the two shortly after midnight of May 21-22, 1982. She testified:
 ". . . I had been sleeping on my stomach, because when I sleep on my back or side I always woke up with aching, and I could sleep better. And something woke me up. And several things — [omitted are about twelve lines in which the alleged victim mentions lights, noise of a radio and something that someone other than the defendant said].
"Q. What took place then?
 "A. The defendant started pounding on my behind with his behind, and he was holding me in a manner as to where I couldn't — When I moved my arm I couldn't get up, get down or do anything. And I tried to scream and it just seemed like it caught in my throat.
 "He pulled my — I sleep with my housecoat on and he pulled my housecoat and my gown up. I was still struggling and I tried to scream. I was trying to scream, you know, and I was trying to get away and it just seemed like it got hung in my throat. And he went through the crotch of my panties and raped me while I was on my stomach. And when I could get leeway to try to get out of there I tried to run, and when I tried to he took his hand and held me down like this, and then he swung my hips over like that and took me a second time.
 "Q. He did have sexual intercourse with you, didn't he?
"A. Twice.
"Q. And I'll ask you did you resist him? *Page 616 
 "A. I didn't give it to him if that's what you are talking about.
"Q. That's what I mean.
"A. I was trying to get out of there.
"Q. Were you in fear?
"A. Yes, sir, I was.
 "Q. You tried to scream but it just hung in your throat?
"A. Yes, sir."
The defendant testified that he was serving time for a conviction of robbery, that on the night involved he had been to a softball game and "arrived back at the jail" about 12:15, "went into the office and got the key from the jailer and went to his cell and unlocked the door of his cell, carried the key back to the jailer and thereafter asked the jailer to let him have the keys again." His testimony continues as follows:
 "A. I asked Palmer [the jailer] to let me hold the keys again to go back to my cell. See, he didn't know I had unlocked the cell. He just gave me the keys, and he gave them to me. And Mrs. Sarah Weathers' [the alleged victim] light was on and I stopped and started talking to her.
 "Q. Where was she in her cell when you first called to her?
"A. At the door.
"Q. She was standing at the door?
"A. Yes, sir.
 "Q. And who was the first one — which one of you spoke first?
"A. She spoke first.
"Q. What did she say?
"A. She asked for some water.
"Q. What did you tell her?
"A. I told her there wasn't no cold water.
"Q. Then what did she say?
"A. She said it would be okay.
"Q. Then, what happened next?
 "A. We started talking about her life and my life then.
"Q. What did y'all say?
 "A. I asked her how long she got to be in jail and she said, `I don't know. They won't give me a bond.'
 "Q. What else was said? What else did either one of you say?
 "A. Then she said, `How long have you got to be in?' And I said, `I'm supposed to get out about September if I make parole.' And she said that would be good. And she asked me — she said, `Do you want to come in and talk to me?' And I said, `I can't. that would be against the rules. I can't go in there.' I wasn't supposed to be at the door or anything because it was against the jail rules, and everything.
"Q. Then what happened?
 "A. Then I asked her, `How long are you going to be in here?' And she said her lawyer was trying, and the judge was trying, to work something out, or something like that, to get her bail set, you know. And she said, `I don't know how long I'll be here.'
"Q. What was said next?
 "A. Then I asked her could I come in and she said it was okay.
 "Q. You asked her if you could come in and she said it was up to you?
"A. Yeah.
"Q. Did she say anything else?
"A. No.
"Q. What did you do then?
"A. I went in.
"Q. Where were the keys then?
"A. I had the keys in my hand then when I asked her.
"Q. You had the keys in your hand?
"A. Yes, sir.
 "Q. Now, after you went in did you say anything to her?
"A. I sat on the bed.
"Q. Then what happened?
"A. We started talking.
"Q. You started talking?
"A. Yes, sir.
"Q. What did you start talking about?
 "A. I asked her if she had ever had anything to do with a black guy.
"Q. What did she say?
"A. `I couldn't say.'
"Q. What?
"A. `I couldn't say.' *Page 617 
"Q. Then what happened?
 "A. Then I started talking to her — rapping to her, and feeling of her, and everything, and she got kind of hot, and then she had sexual intercourse with me.
"Q. What were you wearing at the time?
 "A. I had on this jersey I got on now and some blue hospital pants.
"Q. What was she wearing?
"A. A gown.
"Q. Was she wearing anything other than a gown?
"A. A bra.
 "Q. Now, did she keep her panties on or did she take them off?
"A. She kept them on.
"Q. In what way was she laying on the bed?
"A. She was laying on her back.
"Q. She was laying on her back?
"A. Yes, sir.
"Q. How long did you have sex with her?
"A. About 15 minutes.
 "Q. And while y'all were having sex did either you or she say anything?
"A. No, sir.
 "Q. Did she resist you or try to push you off or anything?
"A. No, sir.
 "Q. After you had sex with her did she say anything to you?
"A. No, sir.
"Q. Did you say anything to her?
"A. I told her I would see her later.
"Q. Then what did you do?
"A. I went outside."
The first issue presented by appellant is thus stated:
 "In a rape case, where there is no evidence of force and no credible evidence of fear, the trial court should have directed a verdict of acquittal or otherwise rendered a judgment acquitting the defendant."
If we accept the defendant's testimony as true, the intercourse was without the required force to constitute rape. However, the testimony of the alleged victim as quoted above shows that the intercourse was forcible. In addition, there was some, though slight, evidence of force as shown by other testimony in the case that there were bruises, though not severe bruises, on her legs. In arguing issue one, appellant emphasizes the failure of the alleged victim to call for help and that she did not report the incident until some six or seven hours later. As to this argument, reference should be made to additional testimony of the alleged victim as follows:
 "Q. How many other women were in the county jail at this time on the night this happened, if you know?
"A. Just myself.
 "Q. Approximately how many prisoners were in that jail, if you know?
 "A. I asked one of the trustees [sic] and I think he said 23. I'm not for sure.
"Q. Twenty-three?
"A. Or sixteen. It was one or the other.
"Q. How many other white prisoners were there?
"A. Mr. Shelby next to me.
"Q. What is Mr. Shalby's approximate age?
"A. I don't know.
"Q. Is he an old man?
"A. He's kind of old, yes, sir.
"Q. How many trustees were in that jail at the time?
"A. There were three.
"Q. Any of them white?
"A. No, sir.
"Q. How about the jailer? Is he a white man?
"A. No, sir.
 "Q. You were in fear of your life until you reported it in the morning, is that correct?
"A. Yes, sir.
 "Q. Did you report it the first opportunity you felt safe in reporting it?
"A. I did.
 "Q. As a result of your reporting this what took place?
 "A. The sheriff was brought to the cell, he was told what happened, they took me *Page 618 
to the hospital and checked me, and everything, and let the jailer go that was on the night shift."
The evidence clearly presented a jury question as to whether sexual intercourse between the alleged victim and the defendant was by forcible compulsion, or, on the other hand, whether it was consensual. The court overruled a motion for a new trial filed by defendant, in which it was asserted that the verdict "was contrary to the evidence," but there was no ground of the motion to the effect that the verdict was against the preponderance or the weight of the evidence and no such issue is presented on appeal. The trial court was not in error in submitting the case to the jury for its determination of defendant's guilt, in overruling defendant's motion for a judgment of acquittal, his motion for a judgment notwithstanding the verdict, or his motion for a new trial.
The court refused defendant's requested charge No. 4, which states:
 "The absence of injury to Mrs. Weathers as well as the absence of damage to her clothing are circumstances that can be considered in determining whether or not Mrs. Weathers consented to have sexual intercourse with the defendant."
The charge was properly refused for the reason that it ignores the testimony of Mrs. Weathers as to what occurred. Appellant is correct that if there was an "absence of injury to Mrs. Weathers" such absence of injury would constitute a circumstance that should be considered in determining whether or not she consented to have sexual intercourse with defendant, but no such hypothesis, nor any hypothesis whatever, is in defendant's requested charge No. 4.
Appellant also contends that the trial court erred in refusing defendant's requested Charge No. 6, as follows:
 "Offense of rape is complete when unlawful intercourse is accomplished by overcoming resistance, and procuring submission by means of threats, though there may be no intention in fact to apply actual force."
Appellant says the charge should have been given, and appellee says it should not have been given, but neither party cites a case in which such charge was ever given or refused. We are puzzled by what is meant by it as applied to the facts of this case. In neither the testimony of the alleged victim nor in the testimony of the defendant can there be found evidence to the effect that submission of the alleged victim was procured by threats by defendant. She said that the intercourse was procured by force. He said it was by consent. The requested charge was abstract in that no threats were made in the instant case, and argumentative in that it implies that there was "no intention in fact to apply actual force." Even in a case in which there was evidence that submission was obtained by threats, it would have been one that would have been potentially helpful to the prosecution and not to the defendant. If it would have been helpful to defendant in the instant case, it would have been so merely in the fact that it would mislead the jury into consideration of a question that was nonexistent under the undisputed evidence of the case. The charge was properly refused.
We do not agree with appellant's fourth contention that the "sentence of fifty years is so excessive as to be an abuse of discretion." Furthermore, it is not within our province to "review sentences within the statutorily prescribed limits."Wallace v. State, Ala.Cr.App., 408 So.2d 171 (1982), cert. den.408 So.2d 173.
Appellant urges in his next issue presented that it was error for the trial court "to refuse to allow a witness to testify about whether before the alleged rape the prosecutrix made a statement about what would happen if somebody messed with her." He says that the "statement, if admitted, would have been very valuable to the defense insofar as showing Sara Weathers' mental operations." We note that during the testimony of the witness Carolyn Gainer, the defendant sought to show by said witness that Mrs. Weathers had made a statement to the witness "about what would happen if somebody messed with *Page 619 
her," and thereafter, out of the presence of the jury, there was a colloquy among the court and counsel for the respective parties as to what the defendant proposed to show by the witness and as to whether he should be allowed to do so. Immediately thereafter, in the presence and hearing of the jury, the following occurred:
 "Q. (Mr. McKinnon [defendant's attorney] continuing). Mrs. Gainer, would you please state whether or not you heard Mrs. Weathers make a statement to the general effect that if anybody messed with her that her husband would get them, and at the same time say she would get out the best way she could?
"A. Yes.
"MR. McKINNON: Okay. Your witness."
We conclude that appellant is mistaken in asserting that "the trial court would not allow the defense counsel to elicit that testimony from the witness."
Appellant's next contention is that the trial court "erred in refusing to allow the defendant to introduce testimony that the prosecutrix had stated that her husband had heard that the prosecutrix had been allowed to go to the upstairs portion of the jail to be with the men up there." This issue is closely related to the immediately preceding issue, which was attempted to be resolved by the same colloquy out of the hearing or presence of the jury. The pertinent part of the colloquy relative to the issue now under consideration is as follows:
 "THE COURT: Now, you propose to show by this witness what?
 "MR. McKINNON: All right, sir. The witness told me that she heard Sara Weathers say that her husband had heard that they would let her, the witness, and Sara Weathers out to go be [sic] with the men upstairs, and that she also heard Sara Weathers say that if anybody messed with her that her husband would get them, and that she was going to get out the best way she could.
 "THE COURT: I sustain the objection to that. I think you are getting into past sexual conduct which is prohibited.
 "MR. McKINNON: Well, we weren't getting — They never went upstairs. We were just trying to show some motivation to show that she was thinking about that.
 "THE COURT: Well, too, that puts the thought in the jury's mind that she and this witness went upstairs and had sexual relations with the men prisoners up there. That is just not proper.
 "MR. McKINNON: All right. Your Honor, I do have an item of testimony that is admissible but I've been having difficulty asking the witness the question.
"THE COURT: What question is it?
 "MR. McKINNON: Well, what I was trying to elicit from her was that she had told me: That if anybody messed with her, Mrs. Weathers, that her husband would get them, and at the same time, `I would get out the best way I could,' that she was trying to use that to show that she was trying to set this trap for the purpose of getting out.
 "THE COURT: If the witness says that she made the statement, `I'll get out the best way I can,' I'll let her answer that."
In our opinion, the trial court was correct for declining to allow defendant's attorney to ask the witness, Ms. Gainer, whether "She heard Sara Weathers say that her husband had heard that they would let her, the witness, and Sara Weathers out to go be with the men upstairs" for the reason, as explained by the trial judge, that such proposed testimony "puts the thought in the jury's mind that she and this witness went upstairs and had sexual relations with the men prisoners up there."
Without the citation of any authority, appellant urges that the trial court should have permitted on request of defendant's attorney the jury to view "the cell that Mrs. Weathers stayed in, and just look at the general layout of the jail." As to this, the court said:
 "I don't believe I'm going to allow that. I'm going to deny the motion for that, because I think you have got plenty of testimony it is adjoining, and you've got pictures of it. And I just don't believe it *Page 620 
would be worthwhile, considering the fact that this is a criminal case, that it's needed to show the scene. I think they have plenty of information already to show the location of the doors and cells and the bunk, so I'll deny that."
The ruling was in accordance with "the general rule that in a criminal prosecution it is within the discretion of the trial court to determine whether the jury should be taken to the scene of the alleged crime." Helton v. State, 55 Ala. App. 428,316 So.2d 355, 359 (1975). We find no abuse by the trial court of the discretion vested in it.
As a final contention for a reversal, appellant says that it was "error for the court to refuse a defendant's motion for a continuance of the rape trial until after the prosecutrix' trial." In the last sentence of his argument as to this issue, appellant's brief states, "A motion to amend the record to more completely reflect the substance of the motion for a continuance has been filed and is pending a ruling by the trial court." Appellants' brief is dated March 16, 1983. It may well be that action has been taken with reference to appellant's motion to amend the record and that the result thereof has not reached this court, but we feel that we are not justified in assuming that the record has been so amended as to make inapplicable what was recently stated in Wilson v. State, Ala.Cr.App., 395 So.2d 1116, 1119 (1981), which we now repeat and apply:
 "The matter of placing cases on the docket for trial, and of granting a continuance, is largely within the discretion of the trial judge, and in the absence of a showing of an abuse of discretion by the trial court, this Court should not disturb the trial court's ruling. Childers v. State, Ala.Cr.App., 389 So.2d 193; Wilson v. State, Ala.Cr.App., 384 So.2d 1243."
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
AFFIRMED.
All the Judges concur.