4 So.2d 439

## MACON v. STATE.

### 6 Div. 769.

Court of Appeals of Alabama.

June 17, 1941.

Rehearing Denied Oct. 7, 1941.

Morel Montgomery, of Birmingham, for appellant.

Thos. S. Lawson, Atty. Gen., and Clarence M. Small, Asst. Atty. Gen., for the State.

RICE, Judge.

Minnie Bell Macon was 26. She was married to Carey Macon, who was 57. And, so far as appears, her relations with Carey were pleasant.

Minnie Bell had a friend—she said he was her cousin—whose age does not, we believe, appear; but who, from the testimony, was a much younger man than Carey.

This friend, Robert Murray, was touchingly attentive to Minnie Bell. He was constantly in her home, practically every day, according to some witnesses; two or three times a week, according to some others.

Robert, be it said, was also a "friend" of Carey's. In his frequent visits to his and Minnie Bell's home sometimes Carey was present, sometimes not. But more often than not he was not, according to at least one witness.

Carey was employed by, as they phrase it, the "T. C. I." As such employee he was covered by an insurance policy, by which, in case he came to an accidental death, Minnie Bell would receive some fifteen hundred dollars.

Some two weeks before Carey's death Robert, so Minnie Bell says, told her he was "going to kill Carey." Upon her asking him why, he said, so the testimony reports her as saying: "So you will have a lot of money."

The testimony likewise reports her as stating—she did not testify upon the trial; nor offer testimony in her own behalf, that she vetoed this suggestion of Robert's. But, so far as appears, she neither reproved him, nor reported his statement to Carey.

On the afternoon of December 28th Robert and one Sam Stewart came to Minnie Bell's home in Sam's car. They were admitted by either Minnie Bell or Carey, both of them being at home. The four indicated indulged in social intercourse briefly; when Robert and Carey withdrew into an inner room for a private word. Directly, Carey re-entered the front, or living room, took up his shoes (he had been barefooted) and put them on, put on his overcoat, and, in answer to Minnie Bell's query, stated he was "going down the street a minute." She admonished him, so the testimony reports her as stating: "I got to go to choir practice tonight; you hurry back."

But he never came back. And that's the last and only word, according to the testimony, ever heard about Minnie Bell's going to "choir practice."

In a short time after Carey went out and away, Robert, who in the meantime had

withdrawn into an inner room with Minnie Bell, for a private word, came out into the living room and asked Sam for the keys to his car, stating that *he* had "to run down the street a minute."

Sam and Minnie Bell were left alone in the living room; where, according to the testimony, they entertained and amused themselves by "playing the radio," and perhaps by other methods.

They waited with manifest patience for some two hours, probably longer, when, at long last, Robert returned with, so far as appears, "no questions asked."

Shortly he and Sam left in Sam's car; and Robert, according to Sam's testimony, was taken to his (Robert's) own home.

Minnie Bell manifested no uneasiness over Carey's failure to return; apparently gave up her "plan" of going to "choir practice" without a murmur; remained at home until bedtime, and retired.

Sometime near midnight the word was brought to Minnie Bell that Carey had been found, dead, on a lonely path through the woods in an uninhabited section of the county. He had bullet wounds through both ears, and into his head, in such a way as to indicate conclusively that he had been shot *twice* at close range; and in such a way as to exclude conclusively the possibility of suicide. In other words he had been *murdered*.

Robert Murray, according to Minnie Bell's statement, narrated by a State's witness in the testimony, had, when he came back to her house with Sam's car, before he and Sam left to go home, taken her into an inner room (away from Sam) and *told* her that he had killed Carey. But, she says, she *didn't believe him.*

On the morning, or very shortly, after the night Carey's body was discovered in this wood's path" mentioned above, the officers of the law interviewed Minnie Bell regarding his disappearance.

In answer to their questions Minnie Bell, who denied, throughout, knowing anything about who killed him, stated that when Carey left home on that late afternoon, just before he was found dead about midnight that night, having been, according to the testimony, dead when found for some six or eight hours, there was no one at her house (but her). This was not true, as above appears, and as she later, under some persuasion by a relative, admitted.

We believe the above is all that the testimony for the State—there was none, as stated, for the defendant—shows.

Minnie Bell Macon and Robert Murray were jointly indicted for murder in the first degree, for the unlawful killing of Carey Macon. A severance was had. And this appeal is from a verdict of the jury trying Minnie Bell, and the judgment of the court rendered thereon, finding her guilty of manslaughter in the first degree and fixing her punishment at imprisonment in the penitentiary for the term of five years.

The judgment of conviction must be reversed on account of a matter to which we will refer later in this opinion. But counsel for appellant has argued so strenuously that she should have had the jury given at her request the general affirmative charge to find in her favor, that we thought it well to express our opinion on that question at the outset.

█ It is of course the law that where, as here, one is sought to be held responsible for a murder with which that one was not physically connected, the evidence must show a conspiracy between that one and the one actually committing the murder. And the conspiracy, confederacy, it is called, "must be real. * * * Mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation." State ex rel. Attorney General v. Tally, Judge, etc., 102 Ala. 25, 68, 15 So. 722, 738.

Robert Murray, according to the testimony—he was not, as indicated above, on trial here— admitted that he shot and killed Carey Macon.

The question presently posed is whether or not the evidence made a case to be decided by the jury as to Minnie Bell Macon's guilty participation therein as a confederate or co-conspirator.

█ "Conspiracy, need not be proved by positive testimony. It rarely is so proved. The jury are to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case." Morris v. State, 146 Ala. 66, 92, 41 So. 274, 280. And see Jones v. State, 174 Ala. 53, 57 So. 31.

Or, as the same principle was differently phrased by Judge Denson in this same case of Morris v. State, supra: "Nor is it necessary that the conspiracy or common purpose should be shown by positive evidence, but its existence may be inferred from all

the attendant circumstances accompanying the doing of the act, *and from conduct of the defendant subsequent to the criminal act.*" (Italics supplied by us.)

■ Applying this principle to the case at bar, it is apparent that no error was committed in refusing to give to the jury at appellant's request the general affirmative charge to find in her favor.

But as stated above, error *was* committed.

■ No principle of the law seems better settled than that "statements of such coconspirator made after the termination of the conspiracy are not admissible, unless so clearly related to the commission of the offense as to be a part of the res gestae or unless made in the presence of the defendant and undenied by him, in which latter case they become admissible under the rule of tacit admissions." Connelly v. State, ante, p. ——, 1 So.2d 606, 607.

■ Here, there were statements admitted into the evidence over appellant's objection, with due exception reserved, of Robert Murray, appellant's alleged co-conspirator, made "after the termination of the conspiracy," and out of the presence of defendant (appellant), said statements being of matters not "so clearly related to the commission of the offense as to be a part of the res gestae." Such admission of such statements, as indicated above herein, was error for which the judgment of conviction must be reversed, and the cause remanded.

It seems unnecessary to consider other questions apparent. They are unimportant and innocuous.

Reversed and remanded.