262 So.2d 313

**Lewis WHITE and James Watson**

v.

**STATE.**

**2 Div. 67 and 68.**

Court of Criminal Appeals of Alabama.

May 9, 1972.

Orzell Billingsley, Jr., Birmingham, for appellants.

William J. Baxley, Atty. Gen., and J. Victor Price, Jr., Asst. Atty. Gen., for the State.

**113**

TYSON, Judge.

Appellants, Lewis White and James Watson, were indicted for grand larceny. Verdict and judgment of guilty resulted in each appellant being sentenced to five years in the penitentiary.

As witness for the State, Eddie Riddle testified that at about 12:00 noon on April 1, 1970, the two appellants came to the store he was operating in Greene County, Alabama, and asked to purchase gasoline for their automobile. After servicing the car, Riddle reentered the store and found the back door open and the store's money box gone. Riddle testified that he did not actually see anyone take the money box.

Robert Williams, who was co-owner of the store that was robbed, testified that the money box belonged to him and that it contained about $255.00 in cash, between $150.00—$200.00 in checks, and food stamps valued at about $30.00. He was not present at the store at the time of the robbery.

Jerry Craig, also known as Jerry Rice, was the companion of appellants on the date in question, April 1, 1970. Prior to the appellants' trial, Craig, a former employee of Robert Williams, owner of the victimized store, pleaded guilty to the robbery of the Williams' store. The following statement made by Craig and given to Sergeant A. L. Graham, a State Investigator with the Department of Public Safety, was used by the State, which claimed surprise, to impeach Craig at appellants' trial:

"A 'Statement dated April 2nd, 1970, at 10:00 P.M., I, Jerry D. Craig, alias Jerry D. Rice, 3025 33rd Avenue North, Birmingham, Alabama, do hereby make the following statement to Sgt. A. L.

Graham, State Investigator, after being advised of my rights. I understand that I do not have to make this statement, and I am making it of my own free will. On March 31st, 1970, Tuesday night, myself, Leecher, otherwise now known as Lewis White—I'm not sure of his name—and another fellow calling himself James Watson got together in Birmingham, Alabama. We all started discussing how we could get some money. I remembered a white man named Poney Williams who lives in West Greene, Alabama, that I used to work for. I also remembered where Williams kept the cash box in the store. We all decided to meet up the next morning at 8:30 P.M. on April 1st, 1970, in Birmingham, Alabama, and go to West Greene, Alabama, and get the money box. We left Birmingham in a 1964 Buick—tan in color, two door convertible. The Negro man known to me as James Watson was driving the car. I sat in the front seat and White sat in the back seat. We came out of Birmingham on U.S. 11 highway to Eutaw, Alabama. We then got on Alabama number 14 and went to Clinton, Alabama, and then on to West Greene, Alabama. We had all decided to make up a story about running out of gas, and I would go around behind Williams Brothers' store and get the cash box while White and Watson kept them busy out in front of the store. White and Watson let me out of the car, and I circled through the woods near where I used to live and got behind the store and hid. Eddie Riddle was running the store, and I saw that he was by hisself in the store. I then saw Watson and White push the car up to Williams store. I then saw Riddle go outside to wait on my two partners. The back door to Williams store was closed but not locked. I pushed open the door and went straight on through and went to the desk and saw a black money box laying on top of the desk in the office. I picked up the cash box and went back out the rear door. I circled back the same way I had came and back

around behind the barn and then on back to the road where Watson and White let me out. When I got back to the road, a man, white fellow, stopped in a fertilizer truck and asked me if I knew any one who wanted to work. I told him 'No,' and he drove off. I then walked back to the car Buick convertible. Watson was still driving and White was in the back seat. We headed back towards Eutaw and turned right at the top of the hill by the church and went to Mt. Hebron. At Mt. Hebron we took a right turn and went on to the river bridge at Gainesville. We crossed the—bridge at Gainesville and took a sharp left detouring around Gainesville and on to Alabama No. 39 towards Livingston, Alabama. I took the money and food coupons and change out of the cash box and threw the cash box out of the right door window. Watson was driving about 90 to 100 miles per hour. Just before we got to U.S. 11 highway, a Sheriff's car turned around on us and began to chase us. We then turned onto U.S. 11 highway and drove for a couple of miles and attempted to turn off the highway onto a dirt road so that we could all get out of the car and run. Watson did not make the turn and wrecked the car. The Deputy Sheriff caught us when we all tried to get out of the right door of the Buick convertible, Tag No. 1A–42672. The Sheriff handcuffed us and picked up the money that was thrown out of the car and carried us to jail. . . .

> "SIGNED: Jerry D. Craig
> "Date April 2, 1970
> "Title, A. L. Graham, Sgt
>      State Investigator

"Witness
"W. E. Raye"

At trial, Craig, as witness for the State, recanted his prior statement. From the record, we find the following colloquy:

"Q What conversation did you have with Lewis White and James Watson about Williams Brothers' store before you came down here?

"MR. BILLINGSLEY: We object, your Honor.

"A I told them . . .

"THE COURT: Just a minute. He may state what took place in any conversation that he had with these defendants. He can state what he said and what they said.

"A Say what Lewis and them said?

"Q Yes.

"A Well I told them that I knowed a man named Williams, Mr. Horace Williams, lived in West Greene, Alabama, and I told Lewis that I needed some money and told him that I could borrow some money from Mr. Williams, and I told him that I knowed the man, that I'd worked for him. When I got down there, Mr. Williams was not in his store.

"Q Mr. Williams wasn't at the store?

"A No sir.

"Q What did you do?

"A Well I seen he wasn't at the store, and I told Lewis that I knowed where his money box was.

"Q All right?

"A And I told Watson to stop the car and let me out, and when I went to get out, Lewis said, 'No,' said, 'Don't mess with his money.'

"Q Said, 'Don't mess with his money?'

"A Yes sir.

"Q What did they do?

"A What did who do; Lewis and Watson?

"Q Yes.

"A Well, Lewis told me, said, 'Craig, don't mess with his money.' I said, 'I know what I'm doing.' He said, 'Well if you know what you're doing, I can't stop you.' And so I got out of the car and went around

to the side of the store and went in the back of the store and got the money box and came out.

"Q   What did you do with it?

"A   What did I do with the money box?

"Q   Yes.

"A   I had the money box.

"Q   And got back in the car?

"A   Yes sir.

"Q   Where was the car when you got back to it?

"A   Well it was parked up there to the pecan orchard about a mile—a half mile from the store.

"Q   What did Watson and White do when you were going in the store?

"A   What did they do?

"Q   Yes.

"A   I don't know exactly what they did, but I know they was buying some gas. They had give out of gas.

"Q   And who was in the store?  Who works at the store?

"A   This colored man.

"Q   That's Eddie Riddle?

"A   Yes sir.

"Q   Where was he when you went in the store?

"A   He was on the outside.

"Q   Selling some gas?

"A   Yes sir.

"Q   When did they drive off?

"A   When did Lewis and them drive off?

"Q   Yes.

"A   Well I don't know.  I couldn't tell you.

"Q   But you were in the store at the time?

"A   Yes sir.

"Q   How did you know where to meet them?

"A   Well I didn't.

"Q   You didn't?

"A   No sir.

"Q   What did you do when you got back in the car with the money box?

"A   What did I do?

"Q   Yes.

"A   Well I told Watson and Lewis that I had took the man's money.

"Q   What did they do?

"A   Well, Watson told me when I came back to the car, Watson told me, said, 'Don't get in my car.'  Said, 'Go on away from here.' and Lewis said, 'Man, don't do the man like this,' said, 'Ain't no need of doing a man like this,' and told me to get in, and I got in the car.

"Q   And where did you go?

"A   We left there and went to Gainesville, Alabama.

"Q   What did you do with the money box?

"A   I throwed it out of the car.

"Q   You threw it out of the car.  Where did you throw it out of the car?

"A   When the Sheriff over in Sumter County got behind us."

Craig subsequently testified at trial that he had made the extra-judicial statement to Officer Graham because he was frightened, but did not deny having made it.

Appellant White testified at trial that he and appellant Watson had accompanied Craig to Greene County for the sole reason that Craig wanted to borrow some money from a Mr. Williams, whom Craig had

previously worked for and borrowed money from sometime in the past.

Watson, who was the driver of the vehicle on the date in question, also gave a statement to Sergeant Graham after being apprehended and after having been advised of his rights. He stated that after arriving in Greene County, he "put Craig out of the car near Williams' Store." He further stated that he was to pick Craig up at 1:15 p. m., and when he and White were driving back to the store for this reason, they experienced car trouble and he "got out and raised the hood and unstop the gas line." It was at this point, Watson stated, that he saw Craig walking along the road toward his car. According to Watson, "When Craig got about 50 yards from us he started running and jumped in the car and said get me away from here. Craig said get me away from here. Craig said these people have started some stuff with me. Craig said they had shotguns."

Watson said at that point he took off at a high rate of speed; that a Deputy Sheriff gave chase; and that he finally wrecked his automobile, which resulted in their being apprehended.

Both appellants professed innocence to being involved in any conspiracy with Craig to rob the Williams' store, and both stated that they had not taken part in said robbery.

These cases came to trial on September 18, 1970, at which time the attorney for the appellants and the District Attorney agreed that these cases were to be tried together.

Appellants moved to quash the venire, alleging systematic exclusion of Negroes from jury service in Greene County. Such motion was denied.

I

We first consider the appellants' claim that Negroes are systematically excluded from juries in Greene County, Alabama, and, more specifically, that Negroes were excluded from the jury which convicted appellants, solely because of their race or color. Appellants assert that because of such alleged discrimination they were denied due process and equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution.

The evidence before us relating to such contentions is that 10 of the 18 grand jurors who indicted appellants were white, and that 9 of the 12 petit jurors who returned guilty verdicts against them were white.

The testimony further established that the venire from which the petit jurors in this case were drawn was comprised of 31 members of the white race, and 19 members of the Negro race, or approximately 40% Negroes.

The testimony of the clerk of the jury commission established that the names which comprised the jury roll for Greene County were obtained from various sources. Among these sources were telephone books, voting lists, letters, telephone conversations, and personal contacts by going into communities and talking to people.

Appellants also presented the testimony of Mr. Ralph Banks, Jr., a practicing attorney in Eutaw, who testified that he had been present at every term of court trying cases for a number of years, and that in examining the venire for appellants' trial it contained the names of some 19 or 20 Negroes. On cross-examination, Mr. Banks further testified that in the past two years (1969–70), the number of blacks to whites on petit juries varies from 12 blacks down to 6 or 7 blacks. The appellants presented no further evidence in support of their motions.

■ The law is clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his own race on the jury which tries him, nor on the jury roll from which grand and petit jurors are selected. Cas-

·sell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839.

As was stated in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 829, 13 L.Ed.2d 759:

"Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."

The evidence in this case in no way established that Title 30, Section 24, Code of Alabama 1940 (Recompiled 1958), which prescribes the appropriate procedure in filling the jury roll, was not complied with.

We note that in Carter v. Jury Commission of Greene County, Alabama, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549, pursuant to the order of the United States District Court, a complete new jury roll was filed in the court as of November 6, 1968. We have not been cited to any other authority which shows that since the new jury roll was established, there have been different standards used as applied by the Commissioners to the members of the Negro community. The indictment in this case was returned in the Fall 1970 Term of Grand Jury, and the trial was also held in the Fall 1970 Term of Circuit Court.

There is no evidence whatsoever that the Greene County Jury commission was influenced by racial considerations in making its new selection of names of prospective jurors. Nor is there any evidence that different standards of qualification were applied by the Commissioners to the Negro community. Further, there was no attempt to demonstrate that the same proportion of Negroes qualified under the standards being administered by the Commissioners. In short, the appellants have offered no evidence to indicate that prospective jurors to fill the jury roll were selected on the basis of anything other than their individual qualifications. See Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

█ In view of the absence of any proof of systematic exclusion of Negroes from the jury roll in Greene County, the appellants' motion to quash the venire and to void the trial jury, both based on alleged discrimination in the selection of jurors, were properly denied.

II

Appellants further contend that they were convicted in violation of Title 15, Section 307, Code of Alabama 1940 (Recompiled 1958), which reads as follows:

"307. *Testimony of accomplices; must be corroborated to authorize conviction of felony.* A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

█ Whether there is sufficient corroborative evidence to go to the jury is a question for the court to decide; whether the evidence is sufficiently corroborated to warrant a conviction is a question for the jury. Fagan v. State, 35 Ala.App. 13, 44 So.2d 634; Smothers v. State, 38 Ala.App. 153, 83 So.2d 374; Freeman v. State, 41 Ala.App. 512, 138 So.2d 56.

██ Corroboration, to be legally sufficient, must be unequivocal and of a substantive character. It must be inconsistent with innocence of the defendant and do more than raise a suspicion of guilt. Sorrell v. State, 249 Ala. 292, 31 So.2d 82. Corroborating evidence need not refer to any particular statement or fact testified to by an accomplice, but if it strengthens the probative criminating force of the accomplice's testimony and tends to connect the defendant with the commission of the offense, it is sufficient to warrant the submission of the case to the jury. Smith v. State, 230 Ala. 413, 161 So. 538; Smothers v. State, 38 Ala.App. 153, 83 So.2d 374;

**118**

English v. State, 38 Ala.App. 377, 84 So.2d 673.

■ Evidence of flight after the crime may be considered as corroborative of the testimony of an accomplice. Prophett v. State, 25 Ala.App. 20, 141 So. 257; Freeman v. State, 41 Ala.App. 512, 138 So.2d 56.

At trial, Eddie Riddle identified the appellants as being at the store immediately prior to the time he discovered the store had been robbed. He stated that they were driving a Buick automobile.

Chief Deputy Sheriff Larry Moody of Sumter County, Alabama, testified that he gave chase to the car driven by appellant Watson, and occupied by appellant White and accomplice Craig, shortly after receiving a radio report about the robbery which described the automobile containing the suspects. Chief Deputy Sheriff Moody further testified that when the chase terminated and the appellants had been apprehended, a search of the car revealed the stolen items.

■ As tenuous as we regard the recanted testimony of the alleged accomplice, Craig, in view of the fact of the appellants' flight after the crime, together with their possession of the stolen items, we find sufficient corroboration of Craig's testimony tending to connect appellants with the offense to allow the evidence to go to the jury. Freeman v. State, supra. Thus, there was sufficient legal evidence from which the jury could find the appellants guilty.

■ Because a reversible error appears on another ground, as hereinafter set out, we feel it necessary to, at this point, comment that the statements of a co-conspirator made after termination of the conspiracy are not admissible by the State in its case in chief unless so clearly related to the commission of the offense as to be part of the res gestae, or unless made in the presence of the appellants and undenied by them. Macon v. State, 30 Ala.

App. 276, 4 So.2d 439; Lancaster v. State, 21 Ala.App. 140, 106 So. 609. However, in the event the State should find it necessary on retrial to again impeach the alleged accomplice, Craig, it should lay a proper predicate for such impeachment by questioning the witness as to the details of time, place, circumstances, persons involved, and as to each aspect of such statement before attempting to offer same in evidence. Bigham v. State, 203 Ala. 162, 82 So. 192, and cases cited; McElroy, Law of Evidence in Alabama, Volume 1, Section 157.01. In so doing, we admonish that Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934; and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L. Ed.2d 476, be carefully followed.

### III

On cross-examination of the State's witness, Craig, the trial court sustained an objection to a question propounded to the witness, and then refused to allow appellants' counsel the right to make an offer of proof as to what he expected Craig's testimony would show pertaining to a letter. From the record we find the following:

"Q You pleaded guilty in this court yesterday, did you not?

"A I did.

"Q And how much time did you receive?

"A Two years.

"Q Did you get probation?

"A No sir.

"Q Did you apply for it?

"A No sir. I didn't have any one to apply for it for me.

"Q What did you say?

"A I didn't have any one to apply for it for me.

"Q I see. You were represented by a Court appointed attorney?

"A Yes sir.

"Q You stated a few minutes ago that you made the statement because you were afraid at the time you made it?

"A Yes sir.

"Q And you were afraid at the time?

"A Yes sir.

"Q Did you write Mr. Williams a letter?

"A I did.

"Q And to whom did you give that letter to?

"A To my wife.

"MR. BANKS: We object to the letter. It has no relevancy.

"THE COURT: Sustain the objection.

"Q Which brother did you write the letter to?

"MR. BOGGS: We object.

"THE COURT: Sustain the objection.

"A Which brother did I . . .

"THE COURT: Wait a minute. Sustain the objection. Don't answer when the Court sustains an objection.

"MR. BILLINGSLEY: We take exception, your Honor. It's very important for this case, and I'd like to make offer of proof.

"THE COURT: The Court will sustain an objection to the offer of proof.

"MR. BILLINGSLEY: I can't make offer of proof?

"THE COURT: No sir.

"MR. BILLINGSLEY: Take exception.

"MR. BILLINGSLEY: That's all."

In Sellers v. State, 7 Ala.App. 78, 61 So. 485, we find the rule governing this:

"It is further settled that on appeal, when error is predicated upon an exception to the action of the trial court in sustaining an objection by the other party to questions propounded to a witness, the trial court will not be put in error, unless it appears that it was made known to the court what testimony it was expected to elicit by the question, and unless it further appears that it was material to the issues in the case. Harris v. Basden, 162 Ala. 367, 50 So. 321; Snodgrass v. Caldwell, 90 Ala. 319, 7 So. 834; Insurance Co. v. Moog, 78 Ala. 284, 56 Am.Rep. 31; Roberts v. State, 68 Ala. 515. Here we do not know what answer the witness would have given to the question, and cannot say, therefore, whether it would be material to the issue; but our lack of information is not due to any failure or neglect on the part of defendant's counsel to attempt, by established methods, to properly inform us and the court below, but to the action of the trial court in refusing to permit him to do so. In this the court was in error. The Constitution guarantees to the accused the right to be heard by himself and counsel, or either. If the court feared that a statement from defendant's counsel as to what he expected to prove by the witness might improperly prejudice the jury, the court should have had the jury to retire, pending the hearing; but certainly the court should not have foreclosed the defendant's counsel of his right to be heard, and thereby rendered it impossible for a reviewing court to pass on the relevancy and competency of the testimony he offers to produce."

See also Brand v. State, 13 Ala.App. 390, 69 So. 379; Spurlock v. State, 17 Ala.App. 109, 82 So. 557; 23 C.J.S. Criminal Law Section 1029.

In view of the fact that the appellants were prevented from making this offer of proof through counsel, we are of the opinion that the judgment must be reversed and the cause be remanded.

Reversed and remanded.

PRICE, P. J., and CATES and ALMON, JJ., concur.