[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 91 
James Earl Carpenter was indicted by the grand jury for the December 21, 1978, first degree murder of Mountain Brook Swim and Tennis Club security guard Oscar Carden. Trial was had on August 27, 1979. The appellant was convicted and sentenced to life imprisonment. From that conviction he now appeals in formapauperis.
Mrs. Ruby Lee Carden, the victim's wife, testified that her husband had worked at the Mountain Brook Swim and Tennis Club as a security guard for approximately three years. She stated that he worked the 10:00 p.m. to 6:00 a.m. shift. Mrs. Carden identified the victim's pistol.
Mr. Jay Glass, Chief Medical Investigator for the Jefferson County Coroner's Office, performed an autopsy upon the victim. He testified that the cause of death was a gunshot wound to the head. Mr. Glass stated that the bullet entered the rear of the victim's head and exited through the right eye orbit. He testified that the gun was held some distance away as no evidence of powder burns was found.
Mr. Paul Shands, a bartender for the Mountain Brook Swim and Tennis Club, testified that he was working the evening of the killing and left the club around 10:05 p.m. He stated that he was the last person to leave, and the victim followed him to the door and locked it. Mr. Shands stated that later his fingerprints were taken.
On cross-examination Mr. Shands testified that he knew Stanley James (one of the four co-conspirators). He stated that James had once worked at the club as a busboy. He testified that another co-conspirator and the brother of the appellant, Billy Carpenter, had also worked there.
Mr. Thomas Slaughter, maintenance man for the club, testified that on December 22, 1978, he arrived for work around 6:00 a.m. He stated that he normally was the first to arrive and had a key to get in. He stated that the victim and he would have coffee together every morning. On December 22, Mr. Slaughter stated that when he arrived the door was unlocked. He entered, found *Page 92 
a liquor bottle on the stairs, and called the victim. Mr. Slaughter proceeded into the club, turned on some lights, and found the victim. After checking for a pulse and finding none, he called the police. Mr. Slaughter stated that he waited in his car for the police to arrive, and no one entered the club until they arrived. Mr. Slaughter testified that the victim's holster was empty. He stated that the bar and office had been broken into. He testified that both Stanley James and Billy Carpenter had been fired and that he had seen the appellant a few times when he had come to pick up Billy. Mr. Slaughter identified several photographs of the scene which were properly admitted into evidence.
Irondale Police Officer Oscar Sorrell testified that on December 22, between 6:15 and 6:30 a.m. he answered a call from the Mountain Brook Swim and Tennis Club. He stated that upon arriving he saw Mr. Slaughter and the liquor bottle on the stairs. Officer Sorrell secured the scene of the crime.
Mrs. Grace Harrison, manager of Mountain Brook Swim and Tennis Club, testified that on December 1978 she was receptionist and treasurer for the club. She stated that she made an inventory of the liquor and, testifying from such, indicated that $210.50 of liquor was stolen. Mrs. Harrison stated both Stanley James and Billy Carpenter had been hired in May or June 1978 and had worked through the summer. She stated that both had kitchen duties and access to it.
Chauncey Simmons, one of the four who had participated in the December 21 killing, was called as a witness for the State. Simmons was a juvenile at the time of the killing and had had the charges against him dropped. Simmons testified that on December 21, 1978, he, together with Billy Carpenter and the appellant, went in Billy's car to the Shoney's restaurant in Hoover and picked up Stanley James who worked there. He stated that James had an unloaded .22 caliber pistol with him. He testified that James asked them whether they wanted to get some cash, to which they affirmatively replied. James said they could get it at Mountain Brook Swim and Tennis Club. Simmons testified that James conceived the plan whereby they would fake having a flat tire in order to use the telephone inside the club and thereby gain entrance. Simmons stated that James said he would go and ask the guard to let him use the phone, and once he got inside would draw his pistol on the guard, tie him up, and lock him in a room. Simmons stated they drove to the club, and the appellant and he got out and went to the rear while James went to the front door. Shortly thereafter James opened the back door, and the appellant and he entered. James had taken the victim's gun and had it pointed toward his back when he opened the back door. Simmons stated they went inside, and James told the victim to sit down and asked him to hold the .22 pistol on the victim. Simmons said that he was going to look for something, so James asked the appellant to hold the pistol on the victim which he did. Simmons testified that James and he went to the kitchen, broke in, got a meat cleaver, went to the bar, and using the cleaver broke into it. Simmons stated that James went to another room, kicked the door in, and looked for the money. During this time, Simmons said Billy was outside in the car. He stated that he found a liquor storage room and began to remove cases of beer. He carried some to the car and told Billy to come and help. Simmons testified that he dropped a bottle of liquor on the stairs while carrying some of the liquor. He stated that James went back to the room where the victim and the appellant were. Simmons said that Billy moved the car, and he got in and waited on James and the appellant. Simmons testified that he heard a thump-like sound and shortly thereafter saw James and the appellant run out of the club. The appellant had the .22 pistol in his hand and said that James had shot the guard. Simmons stated that Billy asked James whether he had shot the guard, to which James said that he shot him in the head because the guard knew him. Simmons testified that they drove toward home and, after fixing a flat, attempted *Page 93 
to sell some of the beer. Simmons said he did not know what time they left the club, but arrived at Billy's house the next morning around 2:00 or 2:30 a.m. Simmons stated that on December 22 they attended a party at the home of James Evans. Simmons testified that they drank some of the stolen liquor. He stated that James had brought both guns to Evans' home.
On cross-examination, Simmons admitted knowing that James had pled guilty to the killing. He stated that while in the club the appellant had taken the victim's glasses off. Simmons testified that on his last trip down the stairs, he had dropped a bottle of liquor and had looked up and saw the appellant at the top of the stairs. He stated about twenty seconds afterwards, he heard the thump-like sound. Simmons stated that they were mad at James for shooting the guard. He testified that when they could not sell the beer, James fired the victim's .38 caliber pistol at their prospective buyer. Simmons stated that the next night they were at James Evans' house and that James had both pistols with him. He stated that when they were leaving James fired the .38 pistol, and Evans acted as if he had been shot. Simmons identified several photographs of the club which were admitted into evidence.
On re-direct examination, Simmons stated that he had been prosecuted by the district attorney's office. He testified that about eight to ten seconds after getting to the car he heard the thump-like sound and about four seconds later saw James and the appellant running from the club. He stated he could not see the door because the car had been moved. Simmons testified that before going to the club, he knew that both James and Billy had previously worked at the club.
Jefferson County Sheriff's Department Evidence Technician David Guthrie testified that on December 22 around 7:30 a. m he went to Mountain Brook Swim and Tennis Club, saw Officer Sorrell, and took several photographs. The photographs were properly admitted into evidence. Deputy Guthrie also found a spent bullet on the floor of the room wherein the victim was shot.
Walter Lewis, uncle of both Billy and the appellant, testified that he was at James Evans' house on December 22 and saw both the .22 and .38 pistols. He stated that he talked to Billy about them, and took the .38 pistol home with him. The next day, after talking to the Sheriff's Department, he gave the gun to Sergeant Paul Couch.
James Evans testified that on December 22, Simmons, James, Billy, and the appellant were at his house. He stated that he saw the .22 and .38 pistols in a bedroom. He testified that James and Billy were there with him. Evans put the guns in a closet and later gave the .38 to Walter Lewis and the .22 to James. Evans stated that James gave it to Evans' brother who returned it to him. Evans later gave the .22 pistol to Sergeant Couch.
On cross-examination, Evans stated that he talked to James in the kitchen wherein James told him that he had killed a man to get the liquor. Evans testified that James said he had killed him because he knew him. Later that evening Evans and James talked again wherein James told Evans that he had told the other three to go outside and he would lock the victim in a closet.
Jefferson County Sheriff's Department Sergeant Paul Couch testified in camera that the appellant was arrested a little after midnight on December 24. He stated that after transporting him to the Fairfield office and advising him of his rights, to which he signed a waiver of rights form, the appellant made a statement. After the proper voluntariness predicate was laid, Sergeant Couch recounted the appellant's statement. The statement described the plan Stanley James had conceived. The appellant said that Chauncey Simmons held a gun on the victim as the others gathered the liquor. He stated that as he was leaving the club, he heard a gunshot. He said that only James was in the room with the victim when the shot was fired. The remainder of the appellant's statement coincides with the testimony of Chauncey Simmons. *Page 94 
On cross-examination, Sergeant Couch stated that the appellant's mother had brought the appellant to the Jefferson County Courthouse and turned him in.
On re-direct examination, Sergeant Couch stated that the order of arrest was: First, Stanley James; second, Billy Carpenter; third, the appellant; and last, Chauncey Simmons.
In the presence of the jury, Sergeant Couch repeated the above testimony. The trial court properly admitted the appellant's statement.
Jefferson County Sheriff's Department Evidence Technician James Howell testified that he lifted numerous fingerprints from the meat cleaver, .22 and .38 pistols, liquor bottle taken by Sergeant Couch from James Evans' house, and file cabinet in the office at the club. He stated that he found Stanley James' fingerprints on the meat cleaver, .38 pistol, and file cabinet. He stated the liquor bottle had on it the fingerprints of bartender Paul Shands.
Both parties entered into a stipulation whereby they agreed that the testimony of Lawdon Yates, a firearms expert with the State Department of Toxicology, would indicate that the spent bullet found in the club had been fired from the victim's .38 pistol.
The State rested its case, and the appellant moved to exclude the State's evidence on the grounds that no conspiracy, felony-murder, and homicide were proved.
The appellant's defense was based on the idea that the killing of the guard was a frolic of Stanley James and totally unconnected with the purpose for which the others and he went to the club. The appellant admits hearing James' plan and knowing beforehand that James had previously worked at the club. His testimony coincides substantially with that of Chauncey Simmons and his statement given to Sergeant Couch. The appellant admits holding the .22 pistol on the victim while the robbery was in progress, but states that he held it by his side and not directly at the victim. The appellant admits that they went to the club to steal liquor. He testified that their plan was to lock up the guard. He testified that as he was getting ready to leave, James told him he would have to kill the guard because he might be recognized. The appellant stated he told James that they had an agreement, to which James told him to go to the car and he would lock up the guard. While planning the crime, the appellant stated that James said that he did not think the guard would recognize him, but if he did he would lock him up so he would not see his face too long. The appellant stated that after the killing James and he walked to the car talking.
The evidence clearly illustrates that the killing occurred during the perpetration of a robbery. Consequently, it is first degree murder under § 13-1-70 Code of Alabama (1975). Woods v.State, Ala.Cr.App., 333 So.2d 178 (1976).
The evidence is equally as sufficient in proving the appellant an accomplice to the murder. § 13-9-1 Code of Alabama (1975). See also Conley v. State, Ala.Cr.App., 354 So.2d 1172
(1977); and cases cited therein.
 I
Appellant contends that the trial court erred in failing to grant his motion for a mistrial, made before the jury was impanelled and sworn, concerning the manner in which the prosecuting attorney had utilized his peremptory strikes. Appellant asserts that the prosecuting attorney used such to remove only blacks from the venire. He argues that since he is black and charged with the murder of a white man such a scheme of striking violates his constitutional rights of due process and equal protection of the law. Appellant presented no testimony to support his allegation.
Although a motion for a mistrial is not the proper procedure for raising this issue, as a trial for double jeopardy purposes had not commenced, we will treat it as properly presenting the issue before us. See, Boswell v. State, 290 Ala. 349,276 So.2d 592, *Page 95 
cert. denied, 414 U.S. 1118, 94 S.Ct. 855, 38 L.Ed.2d 747
(1973).
It is not error for the prosecuting attorney to strike a jury on the basis of race. Bascom v. State, Ala.Cr.App.,344 So.2d 218 (1977); Baker v. State, Ala.Cr.App., 340 So.2d 854, cert. denied, Ala., 340 So.2d 860 (1976); Thigpen v. State,49 Ala. App. 233, 270 So.2d 666 (1972); and cases cited therein. Consequently, appellant's contention is without merit.
 II
Appellant contends that the trial court erred in sustaining the State's objections to questions asked to a State and defense witness concerning statements made the night after the killing by co-conspirator Stanley James which were exculpatory to the appellant.
On December 22 the appellant and his partners in crime attended a party at the house of State's witness James Evans. During the course of the party both State's witness James Evans and defense witness Michael Averhart, who also attended the party, had separate conversations with Stanley James wherein, apparently, James stated that he killed the victim and no one was in the room when such occurred except the victim and him. Mr. Evans' conversation with James appears to have taken place in the kitchen while Mr. Averhart's was conducted in a bedroom. From the record, it appears that both witnesses were not together when both conversations occurred.
During the cross-examination of Mr. Evans, the appellant attempted to elicit testimony concerning such to which the State objected. The appellant made an offer of proof, incamera, asking Mr. Evans the following:
 "MR. JAFFE: My question is did Stanley James say this to you and this in substance, I am the one that shot him and I was the only one in the room. . . .
. . . .
 MR. JAFFE: . . . Did he tell you he was the only one in the room?
THE WITNESS: Yes, sir."
It appears that the appellant was not present during the conversation.
The State objected stating that such called for a hearsay answer and was inadmissible because the conspiracy had ended when the statement was made. The State noted that during the direct examination of Mr. Evans they had not elicited any testimony concerning the conversation.
During the direct examination of Michael Averhart, the appellant attempted to discover the substance of the December 22 Stanley James conversation with the witness. The witness stated once that the appellant was not present when James and he talked, but later changed his testimony and stated that he was. The trial court sustained the State's objection.
 "It is a well-recognized rule that the incriminating acts or statements of one confederate after the ends of the conspiracy have been accomplished, and no longer exist, are not admissible against another in his absence and without his knowledge and consent."
Dailey v. State, 233 Ala. 384, 171 So. 729 (1937). See, Edwardsv. State, 279 Ala. 371, 185 So.2d 393 (1966); Cox v. State, Ala.Cr.App., 367 So.2d 535, cert. denied, Ala., 367 So.2d 542
(1979); Guntharp v. State, 54 Ala. App. 363, 308 So.2d 722, cert. denied, 293 Ala. 756, 308 So.2d 728 (1974); Macon v.State, 30 Ala. App. 276, 4 So.2d 439, cert. denied, 241 Ala. 675, 4 So.2d 442 (1941); and cases cited therein. See generally, Edwards v. State, Ala.Cr.App., 344 So.2d 807, cert. denied, Ala., 344 So.2d 812 (1977); White v. State, 48 Ala. App. 111, 262 So.2d 313 (1972); and cases cited therein. Cf.,Conley, supra, (wherein a statement made by a confederate to a third party was admissible as it occurred before the commission of the offense and indicated a common place plan or design).
Consequently, if declarations are made before or during the furtherance of the conspiracy, they are admissible. However, once the conspiracy has come to an end, by completion of the common plan or design, such declarations are inadmissible *Page 96 
unless made in the presence of and with the knowledge and consent of the other confederate.
We see no logical reason why the above rules should not have equal application to incriminating and exculpatory statements.
In the instant case, the statements by James to both Evans and Averhart were made after the termination of the common enterprise. In addition, the appellant was not present during the conversation James had with Evans, and the testimony of Averhart is all too unclear to determine whether the appellant was present during his conversation with James. Furthermore, the characterization of the statement as exculpatory is tenuous at best since presence alone does not determine the existence vel non of a common plan or scheme. Based upon the facts recited in the record, we find no error in the trial court's ruling.
 III
Appellant asserts that certain comments made by the prosecuting attorney during the re-direct examination of a State's witness and in its closing argument were so prejudicial that the jury was ineradicably influenced to his detriment.
 A
The first comment complained of occurred during the re-direct examination of State's witness Chauncey Simmons. On cross-examination, the appellant asked the witness if he knew that Stanley James had pled guilty to the crime, to which the witness affirmatively answered. The State, on re-direct examination, asked the following:
 "Q By the way, Mr. Jaffe asked you if you knew that Stanley James pled guilty. Do you know that Stanley James pled guilty under the death penalty (act) to life without parole; did you know that?
MR. JAFFE: Your Honor, we object to that question.
 MR. BLACK: The only reason I am asking that question is because the subject was brought up by Mr. Jaffe.
MR. JAFFE: We object to that.
THE COURT: Overruled.
 MR. JAFFE: At this time we would move for a mistrial, based on the fact that the death penalty was mentioned.
THE COURT: Overruled."
The following morning, after having recessed for the evening, the trial court, before the proceedings were resumed, instructed the jury that the disposition of the charges against Stanley James were not germane to the instant cause and should not be considered in any way or degree in reaching their decision. The jury was then polled to ascertain whether it could follow the above instructions, to which it affirmatively responded.
Even though the prosecutor's inquiry may have been irrelevant to the issues before the trial court in the instant cause, the appellant's initial inquiry was as equally incompetent. A party who has elicited irrelevant evidence cannot complain to his opponent's further inquiry into such, albeit to explain, clarify or contradict it, when he previously inquired into such. Bickerstaff v. State, Ala.Cr.App., 369 So.2d 315 (1979);Brock v. State, 54 Ala. App. 310, 307 So.2d 707 (1975); Jones v.State, 52 Ala. App. 184, 290 So.2d 251 (1974); and cases cited therein.
Furthermore, since no answer was given to the question, no error prejudicial to the appellant occurred. Rupert v. State, Ala.Cr.App., 374 So.2d 451 (1979); Kennedy v. State, Ala.Cr.App., 373 So.2d 1274 (1979); Borden v. State, Ala.Cr.App., 371 So.2d 82 (1979); Van Antwerp v. State, Ala.Cr.App., 358 So.2d 782, cert. denied, Ala., 358 So.2d 791
(1978); Calhoun v. State, Ala.Cr.App., 343 So.2d 1 (1977), and cases cited therein. Consequently, appellant's contention on this ground is without merit.
 B
Appellant complains of two comments made by the State during its closing argument. He asserts that the first comment improperly suggested that he had committed *Page 97 
other crimes. The appellant made a timely, specific objection which the trial court overruled. In order to place the alleged improper comment into perspective, we quote from the record:
 "MR. BLACK: Do you all realize what the defense is in this case? Why do they say it, that that man is not guilty, why, what is their reason? They tell you, yes, it is true that these people conspired to rob. Yes, they had a gun. Yes, they took Mr. Carden's gun. Yes, my client held the gun on his back and held him hostage while they were robbing him. That's true. That's true. Yes. Would you please excuse my client?
MR. JAFFE: If Your Honor please —
 MR. BLACK: Yes, my client went out to the party later that night and had him a good time on the blood whiskey.
MR. JAFFE: We have not asked —
THE COURT: Overruled, that is argument.
MR. JAFFE: We except.
THE COURT: All right.
 MR. BLACK: All of that is true, but excuse my client. He has done nothing wrong.
 MR. JAFFE: We object to that. I object to his saying nothing wrong, Judge, that is not what we said.
THE COURT: All right. Overruled, that is argument.
 MR. BLACK: Excuse my client, don't find him guilty. And, I submit to you that what he is charged with isn't the only thing he can be charged with.
 MR. JAFFE: We object to that, saying that is the only thing he could be charged with.
THE COURT: Overruled.
MR. JAFFE: We except.
 MR. BLACK: Excuse my client, because — now, the reason — the robbery is over when Mr. Carden is killed. The robbery is over. My client has taken his gun off of Mr. Carden and walked ten feet when they blew his brains out.
MR. JAFFE: We object to the term —
MR. BLACK: Excuse my client —
 MR. JAFFE: — they blew his brains out. He knows better and we object to it.
 THE COURT: Members of the jury, rely upon the evidence.
. . . .
 MR. BLACK: All the evidence you put on, the most you could do would be to connect James Carpenter to Stanley James the night after —
 MR. JAFFE: We object to that, that is a misstatement because he told the police what happened —
. . . .
THE COURT: Overruled." (Emphasis added).
It is well established that no legal standard exists to judge the prejudical qualities of alleged improper comments by either party. Such must be scrutinized in light of the issues, parties, and general circumstances of the particular case.Hurst v. State, Ala.Cr.App., 356 So.2d 1224 (1978); Harrison v.State, Ala.Cr.App., 340 So.2d 849, cert. denied, Ala.,340 So.2d 854 (1976); Evans v. State, Ala.Cr.App., 338 So.2d 1033
(1976); and cases cited therein.
In the instant case, while the prosecutor's comment appears to suggest that the appellant may have committed other crimes, its clear imputation is that the appellant could have been charged with a different crime for the same offense or incident. It does not suggest that the appellant committed more than one crime to more than one person, but rather that he could have been brought to trial on a different charge. This is different than the situations presented in Racine v. State,290 Ala. 225, 275 So.2d 655 (1973), and McClary v. State,51 Ala. App. 30, 282 So.2d 379, reversed, 291 Ala. 481,282 So.2d 384 (1973), wherein the comments made by the prosecuting attorney suggested that the appellants had committed more than one offense to more than one person. We find no error in the trial court's ruling.
The second comment complained of is:
 "MR. BLACK: Then, when Chauncey Simmons was discharged we were able to use Chauncey Simmons as a witness *Page 98 against him. And believe me, he didn't want to come in here and testify.
 MR. JAFFE: Now, we object to saying that Chauncey Simmons didn't want to come in and testify.
THE COURT: Well, I will sustain that.
MR. JAFFE: And we ask the jury to disregard that.
MR. BLACK: I will withdraw that.
MR. JAFFE: We ask the jury —
THE COURT: It is withdrawn.
MR. JAFFE: And we move for a mistrial.
THE COURT: Overruled." (Emphasis added.)
We note that with the exception of overruling his motion for a mistrial no ruling adverse to the appellant was made by the trial court. In addition, the comment was withdrawn by the prosecuting attorney. Furthermore, both in its opening remarks to the jury and before the presentation of closing arguments, the trial court instructed the jury that the statements and arguments of counsel were not evidence. We find no prejudicial error in the comment or by the trial court's action upon such.Summers v. State, Ala.Cr.App., 338 So.2d 533 (1976); Canada v.State, 56 Ala. App. 722, 325 So.2d 513 (1975), cert. denied,295 Ala. 395, 325 So.2d 516 (1976); Paul v. State, 48 Ala. App. 396,265 So.2d 180, cert. denied, 288 Ala. 747, 265 So.2d 185
(1972); and cases cited therein.
 IV
Appellant's last issue deals with the trial court's refusal to give certain written requested charges to the jury. The appellant submitted seventy-two requested charges, but requested our review of ten refused charges. We have reviewed the remaining charges and find no error in their refusal as they were either abstract, argumentative, confusing, misleading, ungrammatical, not predicated upon the evidence, or substantially covered by the trial court's oral charge.
 A
Appellant's first group of refused requested charges deals with the interest and credibility of witnesses and the effect to a witness' bad character on the jury's finding of a reasonable doubt:
 "23. A reasonable doubt of the accused's guilt may arise from the bad character or motives of the witnesses that testified against him, or from the evidence or failure of proof, or from the presumption of innocence which the law gives him."
 "31. When you determine the credibility of the witnesses, you should also consider the manner in which they testify, whether they have been convicted of crimes involving moral turpitude, the character of the particular witnesses and whether the witness has made statements inconsistent with his present testimony. If you believe any witness has impeached, it is your exclusive province to give his testimony such credibility, if any, as you may think he deserves."
 "36. If the jury believes from the evidence that any person was induced to testify in this case by any promise of immunity from further punishment, or that any hope was held out or entertained by him that he would be rewarded or any way benefit if he implicated the accused of the crime charged herein, the jury must take such fact into consideration in determining what weight should be given to the testimony, closely scrutinize it and unless they can reconcile it with truth, completely reject it."
The trial court gave appellant's requested Charge No. 35 below:
 "35. If you find that any witness has willfully testified falsely as to a material fact, you are at liberty to either disregard his or her enitre (sic) testimony, or to believe such portions of that testimony as you see fit."
Charge No. 23 above was properly refused as it is confusing, argumentative, and with the exception of its first portion, substantially covered by the trial court's oral charge. §12-16-13, Code of Alabama 1975. Furthermore, the trial court *Page 99 
thoroughly and correctly instructed the jury as to the definition of "reasonable doubt." For the trial court to have instructed the jury as the appellant requested would have been to invade their province as weighers of the evidence or finders of fact. No error was committed by the trial court's refusal to give the requested charge. Kuczenska v. State, Ala.Cr.App.,378 So.2d 1182 (1979), cert. denied, Ala., 378 So.2d 1186 (1980);Doss v. State, 23 Ala. App. 168, 123 So. 237, cert. denied,220 Ala. 30, 123 So. 231 (1929).
Charges No. 31 and 36 are ungrammatical and not predicated on the evidence. Consequently, their refusal was not error.
 B
Appellant submits refused requested Charge No. 38, quoted below, should have been given.
 "38. The evidence must be such as to exclude every single reasonable hypothesis except that of the guilt of the accused. In other words, all the facts proven must not only be consistent with and point to the guilt of the accused, but every fact must also be inconsistent with his innocence."
The trial court properly refused the above requested charge as appellant's guilt was predicated upon substantial direct evidence rather than solely circumstantial evidence and to have given the requested charge would have unduly emphasized the circumstantial evidence. See, Lewis v. State, Ala.Cr.App.,372 So.2d 882, cert. denied, Ala., 372 So.2d 885 (1979); and cases cited therein. See generally, Murrell v. State, Ala.Cr.App.,377 So.2d 1102, cert. denied, Ala., 377 So.2d 1108 (1979); and cased cited therein.
 C
Appellant asserts that the trial court erred in refusing to give requested Charges No. 50, 53, 54, 57, 66, and 70 dealing with conspiracy. The requested charges are quoted below:
 "50. Before you can convict James Earl Carpenter, Jr., for the crime of murder of Oscar Carden, you must first find that James Earl Carpenter, Jr., entered into the agreement with others to take the life of Oscar Carden. You must find that James Earl Carpenter agreed to join in the plan of taking the life of Oscar Carden. Mere aid or assistance given by any defendant by others is not sufficient to convict him of the crime of conspiracy to commit murder unless such aid was given by him for the purpose of carrying out the unlawful design of a conspiracy agreed to commit murder."
 "53. The proof shows that James Earl Carpenter, Jr. knew the other three people present at Mountain Brook Swim and Tennis Club. I charge you that a defendant cannot be convicted because of his acquaintance or association with some or all of the conspirators unless it is proven by the prosecution under reasonable doubt, that he had guilty knowledge of, and with such knowledge, participated in a conspiracy to commit murder."
 "54. You are instructed that there can be no conspiracy without a corrupt agreement or understanding. If you have a reasonable doubt as to the participation of James Earl Carpenter, Jr., in a common plan or conspiracy to commit murder, you must return a verdict of not guilty as to him."
 "57. You are instructed that you must view a defendant's own actions, his own conduct, and his own declaration to determine whether he is a conspirator. If you believe from the evidence that James Earl Carpenter, Jr., did not conspire or plan nor did have knowledge that Stanley James would shoot Oscar Carden you must find him not guilty.
 "66. The Court charges the jury that if Stanley James killed the deceased on a frolic of his own without the knowledge and consent of the other defendants and not while in the perpetration of the robbery than (sic) the other defendants cannot be found guilty of murder of the first degree in this case.
 "70. The court charges the jury if you believe that Stanley James killed the deceased because the deceased recognized him from previous associations and that *Page 100 
such killing occurred after the commission of the robbery and without the knowledge and consent of James Earl Carpenter, than (sic) James Earl Carpenter cannot be found guilty of murder."
Charges No. 50, 53, 57, 66, and 70 are ungrammatical and were properly refused. Charge No. 54 was fairly and substantially covered by the trial court's oral charge. Consequently, it was properly refused.
We have carefully examined this record and find same to be free of error. The judgment is therefore
AFFIRMED.
All the Judges concur.