485 So.2d 1134 (1986)
POPE & QUINT, INC.
v.
Cecil B. DAVIS and Virginia C. Davis.
84-1066.
Supreme Court of Alabama.
February 28, 1986.
*1135 Jeffry A. Head of McFadden, Riley & Parker, Mobile, for appellant.
Peter F. Burns of Morgan & Burns, Mobile, for appellees.
JONES, Justice.
This suit arose from an alleged breach of contract. The contract into which the parties entered was a real estate listing which granted Plaintiff, Pope & Quint, the exclusive right to sell the residence of Defendants, Cecil and Virginia Davis. A jury returned a verdict in favor of Defendants, and it is from the ensuing judgment that Plaintiffs appeal.

FACTS
On October 21, 1981, the Davises listed their residence on Springbank Road in Mobile for sale through Pope & Quint, a real estate agency. The terms of the listing agreement granted Pope & Quint the exclusive right to sell the residence, and called for a cash commission of seven per cent of the gross amount of any sale of the property, or of any agreement to sell negotiated during the existence of the contract. The agreement also contained an extension clause which entitled Pope & Quint to a commission if within 90 days of the expiration of the contract the house was sold to anyone to whom Pope & Quint had presented the house during the listing period.
Sometime in 1981, Mr. Davis began talking to a friend of his, Mr. Cunningham, about buying the house. He informed Pope & Quint's agent that he thought Cunningham was a good prospect and asked her to get in touch with him.
*1136 In March of 1982, Mr. Davis invited Mr. Cunningham and his wife over to look at the house. He then had Pope & Quint prepare for Cunningham an "offer to purchase," and made an appointment with Mr. Cunningham so that he and the agent could present the offer. Mr. Cunningham made it quite clear that he could not afford the house on the terms presented.
In May, Pope & Quint replaced the agent who had been handling the Davises' house. Shortly thereafter, Mr. Davis called the new agent to inform her that he had arranged another meeting with Cunningham to promote the sale.
On July 14, Mr. Davis again called Pope & Quint's agent to inform her that the Cunninghams were ready to purchase the house. The agent prepared for the Cunninghams an offer to purchase the house for $220,000. Closing was to be within 10 days after the Cunninghams sold their house. The agent also obtained a listing agreement on the Cunninghams' house in connection with their purchase of the Davises' house.
In helping the Cunninghams determine the resale value of their house, the agent told them that she had recently sold a comparably sized house in the same neighborhood for $98,000. Sometime later she told the Cunninghams that they could probably expect to receive only $75,000 for their house.
In late September or early October, the Cunninghams decided to cancel their listing with Pope & Quint, take their house off the market, and consider the deal closed. They no longer intended to buy the Davises' house. They explained to Mr. Davis that, because their house was not worth as much as they had been led to believe, they could not afford to buy his house.
Mr. Cunningham offered to forfeit the $5,000 penalty called for in his offer to purchase, but Mr. Davis refused the penalty and agreed that the Cunninghams should get their earnest money back. Mr. Cunningham then called Pope & Quint and told them that he no longer intended to buy the Davises' house or to sell his own. On October 7, Pope & Quint sent Mr. Cunningham a letter confirming the cancellation of the listing of his house.
On October 11, Mr. Davis sent a letter to Pope & Quint and its lawyer, stating that the agreement of July 14 would not result in the sale of his house, and requesting that Pope & Quint return to Mr. Cunningham his earnest money.
Sometime around November 1, the Davises did indeed sell their house to the Cunninghams, but on substantially different terms from those contained in the July 14 contract.[1] It is from this ultimate sale that Pope & Quint claims it should have received a commission, even though the sale took place more than 90 days after the expiration of the contract.

ARGUMENTS
Pope & Quint's primary argument is that the contract between it and the Davises contained a provision which granted a commission to Pope & Quint not only upon the sale of the property, but also upon an agreement to sell. Because the Davises eventually sold the property to the Cunninghams, the couple with whom they had reached an agreement to sell during the existence of the contract, then Pope & Quint, it argues, is due to receive the commission as a matter of law.
This argument is countered by the Davises, who aptly demonstrate that the ultimate contract of sale differed substantially from the agreement to sell which had been entered into earlier. Pope & Quint tries to discount the differences between these two *1137 contracts by arguing that the differences were not material ones. However, while the gross amount of the sale did not differ, the second contract clearly demonstrates a greater flexibility in arriving at that figure. Such substantial variances in the terms of the contracts could not seriously be characterized as immaterial.
We reject Pope & Quint's contention that it was entitled to a sales commission as a matter of law, and hold that the trial court did not err in submitting this factual issue to the jury. At the very least, the jury was justified in finding that this second contract of sale differed from the first and therefore fell outside the scope of the commission clause of the contract between the Davises and Pope & Quint.
Pope & Quint next argues that the trial court erred in excluding certain of its evidence. Specifically, it complains of the trial court's ruling excluding evidence that the Davises' attorney bought the Cunninghams' house. The trial judge's ruling reflects his concern that introduction of the evidence would serve only to confuse or prejudice the jury. The trial judge perceived the proffered evidence as being directed more toward proving fraud than any claim for breach of contract. Because this suit was based solely upon a breach of contract theory, we find here no abuse of discretion in the trial judge's ruling excluding the evidence.
Finally, Pope & Quint argues that the trial judge erred in denying it the right either to impeach its own witness, or to cross-examine him as an "unwilling witness." The determination of whether a party is an "unwilling or hostile witness," as referred to in Rule 43(b), A.R.Civ.P., is a matter within the discretion of the trial court. Here, the trial court found that this witness did not fall within that category; and, because we find the evidence supports that determination, we hold that the trial court did not abuse its discretion. The matter of impeachment, however, poses another question. Dean Gamble has interpreted Rule 32(a)(1), A.R.Civ.P., as implying that "any party can use a deposition to impeach any witness at any time." C. Gamble, McElroy's Alabama Evidence, § 165.01(6) (3d ed. 1977). Although our research has uncovered no authority directly on point, (see, e.g., White v. State, 48 Ala.App. 111, 262 So.2d 313 (1972)), a reasonable interpretation of the rule would indicate that impeachment of the witness should have been allowed, provided, of course, that a proper foundation was laid and that the proffered evidence related to a material issue.
The colloquy between the court and counsel, however, indicates that the attempted impeachment of the witness was, again, merely for the purpose of showing some fraudulent activity on behalf of either the witness or the Defendants. Plaintiff's offer of proof with respect to the attempted impeachment clearly indicated that it was unrelated, and thus immaterial, to the breach of contract claimthe only claim asserted against the Defendants. Thus, the trial judge was correct in excluding testimony directed toward showing fraud. For this reason, the trial court's ruling must be affirmed.
AFFIRMED.
MADDOX, SHORES and ADAMS, JJ., concur.
TORBERT, C.J., concurs specially.
TORBERT, Chief Justice (concurring specially).
An "owner and broker are free to frame their agreement as they see fit and may make the broker's commission dependent upon whatever conditions they agree upon so long as such conditions are not unlawful or contrary to public policy." Mellos v. Silverman, 367 So.2d 1369, 1371 (Ala. 1979). Accord, Kenney v. Clark, 120 Ga. App. 16, 169 S.E.2d 357 (1969). The agreement by the parties in this case stipulated that a commission was due if there was "any sale, agreement to sell, or exchange... negotiated during the existence of this contract." In addition, an extension clause provided that a commission was due "if *1138 within 90 days after the expiration of this contract, a sale is made to any person who was shown the property, or to whom it was presented for sale...." Therefore, regardless of what the general law is concerning a broker's entitlement to commissions, the parties contractually created the above conditions.
Because the sale took place outside the 90-day period provided for in the extension clause, the appellant is entitled to a commission only if the property was sold by virtue of the same "agreement to sell" that was negotiated during the term of the contract. A question of fact existed as to whether the ultimate sale to the Cunninghams was made under the same terms as the earlier agreement. The appellant was not entitled to a commission as a matter of law. The factual dispute was decided adversely to the appellant, and I agree that the judgment is due to be affirmed.
NOTES
[1] Appellees' brief points out that the contract of July 14 was a conditional contract for sale, contingent upon the sale of the Cunninghams' house, and required $30,000 down and a $190,000 vendor's lien at a fixed interest rate of 14 percent. The ultimate contract of sale, on the other hand, was unconditional. It required no down payment, but resulted in an assignment by the Cunninghams of the equity which they had in their house. The balance of the purchase price was secured by three notes of varying rates of interest, which matched the favorable financing the Cunninghams had received on their house.